In the Matter of INFANT GIRL W., A Child in Need of Services,

R.K.H. and K.A.B., on behalf of themselves and their minor child M.A.H., Appellants-intervenors,

v.

Morgan County Office of Family and Children, Appellee-petitioner.

In re; the Matter of the Adoption of M.W.

Morgan County Office of Family and Children, Appellant,

v.

R.K.H. and K.A.B., Appellees-petitioners.

No. 55A01–0506–JV–289.

Court of Appeals of Indiana.

April 13, 2006.

Patricia M. Logue, Lambda Legal Defense, and Education Fund, Inc., Chicago,

IL, Barbara J. Baird, Law Office of Barbara J. Baird, Indianapolis, for Appellants.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

BAKER, Judge.

This is a consolidated appeal, and all of the issues presented herein involve M.A.H., an eighteen-month-old girl, and the desire of her foster parents, who have cared for M.A.H. since she was two days old, to adopt her and become a legally-recognized family unit. M.A.H.'s foster parents, R.K.H. and K.A.B., are an unmarried couple. Everyone involved in this case, including the Morgan County Office of Family and Children (OFC) and the judge who has blocked the adoption, believes that R.K.H. and K.A.B. have provided a loving, supportive, healthy, and happy home for M.A.H., and everyone except the Morgan County Juvenile Court believes that it is in the best interests of M.A.H. that the adoption proceed. Although this appeal presents a number of issues, the primary question we must resolve is one of statutory interpretation, namely, whether the Indiana Adoption Act [1] permits an unmarried couple—any unmarried couple, regardless of gender or sexual orientation—to file a joint petition for adoption.

The first set of issues concerns M.A.H.'s adoption in Marion County (the adoption case). In the adoption case, appellant OFC argues that the Marion Probate Court erred in granting the joint adoption petition of appellees-petitioners R.K.H. and K.A.B. (the Parents) because the Morgan Circuit Court opposed it and because Indiana law limits adoption to married cou-

ples and to individuals. Concluding that the Probate Court properly exercised jurisdiction over the Parents' joint petition and that petition was properly granted, we affirm the judgment of the Probate Court.

The second set of issues surrounds M.A.H.'s Child In Need of Services (CHINS) proceedings in Morgan County (the CHINS case). In the CHINS case, appellants-intervenors the Parents argue that the Morgan Juvenile Court erred in refusing to dismiss the CHINS action and in voiding the Probate Court's adoption decree. Specifically, the Parents argue that these orders were erroneous because the adoption satisfied M.A.H.'s dispositional goal and because the Juvenile Court was not entitled to treat the final judgment of a sister court as void. Concluding, among other things, that the Juvenile Court improperly refused to dismiss the CHINS proceeding, we reverse the judgment of the Juvenile Court.

## FACTS [2]

M.A.H. was born on September 22, 2004, in Morgan County. Her biological father is unknown and has never registered with Indiana's putative father registry. M.A.H.'s biological mother decided to have the baby placed for adoption. When M.A.H. was two days old, OFC placed her with the Parents, who are licensed foster parents, and she has lived continuously in their home since that time. The Parents are both in their mid-thirties and have lived together in a committed relationship in Indiana for over eleven years.

### The CHINS Case

As the result of M.A.H.'s birth mother giving her up for adoption, M.A.H. was

---

1. Ind.Code § 31–19 *et seq.*

2. We held oral argument on February 10, 2006, in Indianapolis. We commend counsel for their able written and oral presentations.

adjudicated a CHINS on September 28, 2004, in the Morgan Juvenile Court. Additionally, the related but separate proceeding regarding the termination of the parental rights of M.A.H.'s biological mother and father (the TPR case) was on the docket of the Morgan Juvenile Court.

On November 19, 2004, the Morgan Juvenile Court conducted a hearing in the TPR case[3] on its own motion. Following the hearing, Judge Hanson entered an order providing, among other things, as follows:

3) That the OFC (Petitioner) has filed a petition to voluntarily terminate the mother's parent-child relationship pursuant to I.C. 31–35–1–4.

4) That two of the allegations necessary in such a petition include that:

a) Termination of the parent-child relationship is in the child's best interest; and

b) That Petitioner has developed a satisfactory plan of care and treatment for the child.

5) That in the petition in this case, the OFC has forwarded a plan for adoption for infant [M.A.H.].

6) That the OFC informed the Court after a prior hearing ... that in fact an individual and not a couple would be adopting this child.

7) That the Court defines "couple" as a man and a woman that are married.

8) That the Court defines "individual" as any person not married and considers persons cohabiting with one another to be individuals.

9) That during this hearing, Fran Austin, the OFC representative testified regarding how children are placed in foster homes and discussed what a hard to place child[4] is.

10) That Fran Austin testified that this child, infant [M.A.H.], is not a hard to place child.

11) That Fran Austin has worked the past few years for the local OFC and also worked for the same OFC in the late 1990s for several years.

12) That Fran Austin was asked that [sic] if he knew if any non-hard to place child was ever placed with an individual, rather than a couple for adoption.

13) That Fran Austin was unable to recall any case where a non-hard to place child was given to an individual to adopt.

14) That Fran Austin did testify that he was aware of two (2) occasions where individuals were allowed to adopt a child, but when further questioned, both of those cases involved a hard to place child.

\* \* \* \* \* \*

18) That the Court may fairly assume that in all past cases in Morgan County, a non-hard to place child has never been placed with an individual rather than a couple for adoption.

19) That this non-hard to place child must be adopted by a couple, if possible.

20) That the Court finds the OFC's plan to place this non-hard to place child up for adoption with an individual

---

3. This hearing is also referenced in the Chronological Case Summary in the CHINS case, indicating that Judge Hanson may have considered it to be a part of both the CHINS and TPR cases.

4. A "hard to place child" is a child who is disadvantaged because of ethnic background, race, color, language, physical, mental, or medical disability, or age. Ind.Code § 31–9–2–51.

rather than a couple is not a satisfactory plan as required by statute.

21) That the Court finds that the OFC's plan is also not in the child's best interest to place this child with an individual, rather than a couple as they have in every other case where the child is not hard to place.

22) That the Court will further take the matter of terminating the mothers' [sic] rights under advisement awaiting further information on the unknown father in this case and on the compliance with this order.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1) The OFC is ordered to develop a satisfactory plan for care and treatment that includes a plan to adopt this non-hard to place child with a couple, rather than an individual.

2) That the OFC shall publish notifications as necessary and as discussed in Court in attempts to find the unidentified father.

3) That the attorney for the unknown father shall attempt to discover who the father is with the information gleaned from this hearing.

OFC's App. p. 25–27. Previously, on November 3, 2004, the Morgan Juvenile Court had voluntarily terminated the biological mother's parental rights in the TPR case, but the November 19 order, as noted above, took the matter of terminating her parental rights "under advisement ...." *Id.* at 27. Judge Hanson decided not to disturb M.A.H.'s foster care placement with the Parents until a licensed pre-adoptive married couple could be found.

At a hearing on December 20, 2004, Judge Hanson clarified that his November 19 order directed OFC to find a married couple to adopt M.A.H. because he believed that was in her best interests.

Judge Hanson also specifically stated that his decision had nothing to do with the fact that the Parents are a same-sex couple, emphasizing that his decision turned on the fact that they are an unmarried couple. On March 22, 2005, the Morgan Juvenile Court issued a nunc pro tunc dispositional decree in the CHINS case, which stated that "the permanency plan for [M.A.H.] is Adoption." Parents' App. p. 90.

### The Adoption Case

On January 28, 2005, the Parents filed a joint petition for adoption in the Marion Probate Court. Their petition acknowledged that M.A.H. was a ward of OFC. On March 15, 2005, M.A.H.'s biological mother consented to the adoption in writing. On April 21, 2005, the Probate Court held a hearing on the Parents' petition for adoption. At the hearing, the following evidence was introduced:

- A licensed child placement agency, Paralegal On Call, Inc., conducted a home study and provided a favorable report to the Probate Court regarding the Parents and their care for and relationship with M.A.H.

- Barbara Witze, the Court–Appointed Special Advocate (CASA) for M.A.H., who had met frequently with the family, recommended that the adoption go forward. She testified regarding her opinion that M.A.H. "needs to stay in a safe, loving, nurturing home that she's been in since, almost since she was born." OFC App. p. 19.

- OFC, while objecting to the adoption and withholding its consent solely because it believed it was compelled to do so by Judge Hanson's November 19 order, told the Probate Court that "the only objection we would have, is that our court will not allow us to use these two people as our satisfactory plan of care and treatment. *We do*

*admit that they are wonderful parents, and we have absolutely no problem with them,* but we have a Judge's order that prevents us from consenting at this time." Parents' App. p. 159–60 (emphasis added).

No other objections were raised to the adoption and no one offered any other evidence against the adoption.

The Marion Probate Court granted the joint adoption the same day, issuing a four-page written decree and finding the adoption to be in M.A.H.'s best interests. Among other things, Judge Dieter found as follows:

15) The purpose of Indiana's adoption statutes is to protect and promote the welfare of children by providing them with stable family units. *Matter of Paternity of Baby Girl,* 661 N.E.2d 873, 877 (Ind.Ct.App.1996). The primary concern in every adoption proceeding is the best interest of the child, and providing a child with two parents by adoption promotes a stable, supportive and nurturing environment and additional legal protections for the child, advantages that are clearly in the child's best interest. *In re: the Adoption of K.S.P.,* 804 N.E.2d 1253 (Ind.Ct.App.2004); *In re: the Adoption of M.M.G.C.,* 785 N.E.2d 267 (Ind.Ct.App.2003). Indiana statutes do not require that a couple adopting a child be legally married.

16) Petitioners are in good health, have a steady income, and share a good home life together. Both of the Petitioners are bonded to the child, have jointly shared parenting responsibilities since the child's birth and are both in fact acting as parents to the child. The Petitioners love and care for one another as parents do in an appropriate family unit.

17) The Court finds that the adopting parents are of sufficient ability to rear the child and to furnish the child with suitable support and education.

Parents' App. p. 95. The unknown father was deemed to have irrevocably consented to the adoption as a matter of law because of his failure to register as a putative father. *See* Ind.Code §§ 31–19–9–6(B), 31–19–5–8. Accordingly, the Probate Court terminated the parental rights of M.A.H.'s biological mother and the putative father. Applying Indiana Code section 31–19–9–8(a)(10), the Probate Court found that the reasons for OFC's refusal to consent to the adoption were not in M.A.H.'s best interests and, consequently, that the agency's consent was not required.

*Post–Adoption Proceedings*

On April 21, 2005, OFC provided the Morgan Juvenile Court with an informational update, informing Judge Hanson that the Parents' joint petition for adoption of M.A.H. had been granted that day over OFC's objection. OFC also apprised the Juvenile Court that First Steps had evaluated M.A.H. and determined that her development was "age appropriate" and no longer needed ongoing services. Parents' App. p. 164.

On April 26, 2005, the Morgan Juvenile Court held a hearing in the CHINS case that was originally intended to contemplate the removal of the Parents as M.A.H.'s foster parents.[5] Judge Hanson accepted the adoption decree into evidence and granted the Parents' motion to intervene in the CHINS case. The Parents

---

5. OFC had not previously and did not at that time make a request to remove the Parents as M.A.H.'s foster parents because the married couple with whom it intended to place M.A.H. had not yet completed the required training.

presented a motion to dismiss the CHINS case, arguing that M.A.H. had been adopted, that she was no longer a CHINS, and that no new or amended CHINS petition had been filed naming R.K.H. or K.A.B. as parties or alleging that M.A.H. was endangered in their care. Counsel for the CASA agreed that the court had a mandatory obligation to dismiss the case because the dispositional goal of adoption had been met and M.A.H.'s birth parents were no longer involved. *See* Ind.Code § 31–34–21–11. The Morgan Juvenile court denied the motion to dismiss.

On May 5, 2005, OFC filed a report in the CHINS case, stating that "[i]t is the position of [OFC] that the adoption is not legal due to the Morgan Circuit Court having jurisdiction of the child." Parents' App. p. 101–02. Neither OFC nor any other party moved in the CHINS case to treat the adoption decree as void. Also in the May 5 report, OFC noted that it had evaluated M.A.H. and that there were no concerns about her development. For the first time, OFC identified a specific married couple with whom M.A.H. could be placed. On May 6, 2005, the CASA submitted a report to Judge Hanson, recommending that M.A.H. remain with the Parents and stating that dismissal of the CHINS action was in her best interests.

On May 10, 2005, OFC filed a motion to correct error in the adoption case. It raised several alleged errors for the first time, including an alleged failure by the Parents to serve the petition on OFC, and offered no affidavits in support of its motion. The Parents opposed the motion and attached, among other things, an affidavit verifying that their attorney had served the adoption petition on OFC. The Probate Court denied OFC's motion on May 16, 2005.

On May 11, 2005, the CASA called M.A.H.'s OFC family caseworker, Garnet Holsapple, to testify about the May 5 report. Holsapple testified that she only recommended the removal of M.A.H. from the Parents' home because she felt compelled to follow Judge Hanson's November 19 order and that otherwise, she would have recommended that M.A.H. remain with them. She also testified that she had never previously recommended that a child be removed from a home when she believed that remaining in the home was in the child's best interests.

At the conclusion of the May 11, 2005, hearing, the Morgan Juvenile Court orally explained that it "does not recognize the authority of th[e Marion Probate] court to do anything on this case." Parents' App. p. 15. On May 17, 2005, Judge Hanson entered a written order adopting three rulings recommended by OFC: (1) M.A.H. shall remain a CHINS under the placement and care of OFC; (2) M.A.H. shall be placed with the pre-adoptive family; and (3) M.A.H.'s biological mother shall provide the court with information of relatives willing to care for the child. Parents' App. p. 14–16. The Juvenile Court granted the Parents' motion to enjoin enforcement of these orders pending interlocutory appeal.

On June 3, 2005, at the Parents' request, the Morgan Juvenile Court certified for interlocutory review its April 26 order refusing to dismiss the CHINS action and its May 17 order containing the three rulings set forth above. On August 29, 2005, we granted the Parents' petition for interlocutory review and consolidated the CHINS case with the adoption case.

The OFC now appeals the grant of the adoption petition and the Parents now appeal the Juvenile Court's April 26 and May 17 orders.

## DISCUSSION AND DECISION

### I. The Adoption Case

OFC argues that the Marion Probate Court erred in granting the Parents' joint

petition for adoption. Specifically, OFC contends that the Probate Court should not have granted the petition in light of the Morgan Juvenile Court's opposition to the adoption and that the Adoption Act limits adoption to married couples and to individuals.

▪▪▪ As we consider these arguments, we note that we will not disturb the trial court's decision in an adoption proceeding unless the evidence at trial leads to but one conclusion and the trial court reached the opposite conclusion. *Adoption of M.L.L.*, 810 N.E.2d 1088, 1091 (Ind.Ct. App.2004). We will neither reweigh the evidence nor assess the credibility of witnesses, and we will examine only the evidence most favorable to the trial court's decision. *Id.* We owe no deference, however, to the trial court's legal conclusions. *In re Adoption of M.M.G.C.*, 785 N.E.2d 267, 269 (Ind.Ct.App.2003).

### A. Standing

▪▪ First, we must consider the Parents' argument that because OFC was not a party below, it does not have standing to appeal from the adoption decree. *See* Ind. Code § 34–56–1–1 (providing that a "party" may appeal from a final judgment). Our Supreme Court has emphasized in the past that "one cannot appeal a judgment entered in a proceeding in which one was not a party." *Matter of Guardianship of Coffey*, 624 N.E.2d 465, 465 (Ind.1993).

In the normal course, OFC's consent to the adoption would have been required because it was responsible for M.A.H.'s care and placement and because it had legal custody of M.A.H.[6] Accordingly, OFC was entitled to receive notice of the pending adoption. I.C. §§ 31–19–2.5–3, –9–1(a)(3). OFC has been heavily involved in

M.A.H.'s adoption proceeding at every key juncture, as it should have been, given that it was M.A.H.'s legal guardian. We are persuaded that under these circumstances, OFC is a party to the case and has standing to appeal the Probate Court's ruling.

### B. Jurisdiction

Next, we turn to OFC's arguments that the Probate Court should not have granted the Parents' petition because comity prevented it from exercising jurisdiction over this case as a result of the pending CHINS case in Morgan Juvenile Court.

▪▪ OFC directs our attention to the following passage, which provides a general description of comity:

> When an action is pending before a court of competent jurisdiction, other courts must defer to that court's extant authority over the case. Courts observe this deference in the interests of fairness to litigants, comity between and among the courts of this state, and judicial efficiency. Trial Rule 12(B)(8) implements these principles. This rule applies where the parties, subject matter, and remedies of the competing actions are precisely the same, and it also applies when they are only substantially the same.

*Thacker v. Bartlett*, 785 N.E.2d 621, 625 (Ind.Ct.App.2003) (citations omitted). Trial Rule 12(B)(8) implements this principle by permitting dismissal of an action on the ground that the same action is pending in another Indiana court. *Davidson v. Perron*, 716 N.E.2d 29, 35 (Ind.Ct.App.1999). Comity comes into play only where there is precise or substantially similar identity of parties, subject matter, and remedies in

---

6. As discussed more fully below, the probate court may properly grant the petition to adopt even if OFC withholds its consent if the court finds that the reasons for the withheld consent are not in the child's best interests. I.C. § 31–19–9–8(a)(10).

the competing actions. *Thacker,* 785 N.E.2d at 625. We also examine whether the outcome of one competing action will affect the adjudication of the other. *Davidson,* 716 N.E.2d at 35.

 Here, OFC acknowledges that a motion to dismiss pursuant to Trial Rule 12(B)(8) is the appropriate vehicle with which to challenge a trial court's jurisdiction on the basis of comity. But OFC never filed such a motion to dismiss. Indeed, OFC's *only* objection to the adoption was based on the ground that OFC believed its hands were tied because of Judge Hanson's November 19 order. In its motion to correct error, filed after the Parents' petition had already been granted, OFC objected for the first time based on the pending CHINS and TPR cases, though it never invoked comity in that motion. Accordingly, OFC has waived its argument regarding comity, inasmuch as it failed to object on those grounds or to file a 12(B)(8) motion to dismiss. *Grand Trunk W. R.R. Co. v. Kapitan,* 698 N.E.2d 363, 365–66 (Ind.Ct.App.1998) (holding that party must make "specific and timely" objection to court's exercise of jurisdiction "at the first opportunity" to avoid waiver).

OFC contends that it did not waive these arguments, noting that the Parents had notice of the pending CHINS and TPR cases during the adoption proceeding. It points to OFC's submission of Judge Hanson's November 19 order into evidence in the adoption proceeding, going so far as to complain that "[a]lthough the OFC lawyer appearing at the adoption hearing only submitted the order without offering any argument, the Appellees were naïve to think that the matter would end there simply because the OFC was sympathetic to their interests." OFC's Reply Br. p. 5. We do not believe that it is "naïve" to expect a party to comply with the rules by raising a timely and specific objection to

the trial court's jurisdiction at the first opportunity. Because it failed to raise a timely and specific objection regarding the Probate Court's jurisdiction, OFC has waived these arguments.

 Waiver notwithstanding, given our preference to resolve cases on their merits, we will address OFC's arguments that comity prevented the Marion Probate Court from exercising its jurisdiction to consider and rule on the Parents' joint petition for adoption. We must first examine the nature of the three proceedings at issue—the adoption, CHINS, and TPR cases—before we can determine whether they are so interrelated that the Marion Probate Court was overstepping its jurisdictional bounds in considering the adoption case.

 In a CHINS case, a juvenile court facilitates services, care, and custody of a CHINS, but does not create or rescind permanent family ties. Juvenile courts have exclusive original jurisdiction over CHINS cases. *Matter of Adoption of T.B.,* 622 N.E.2d 921, 923–24 (Ind.1993); *State ex rel. Gosnell v. Cass Circuit Court,* 577 N.E.2d 957, 958 (Ind.1991); Ind.Code § 31–30–1–1.

A TPR proceeding determines whether a parent-child relationship will be terminated. Ind.Code § 31–35–2–8. Probate courts have concurrent original jurisdiction with juvenile courts in proceedings on a petition to terminate the parent-child relationship involving a CHINS. I.C. § 31–35–2–3.

 Adoption establishes a family unit, " 'sever[ing] the child entirely from its own family tree and engraft[ing] it upon that of another.' " *T.B.,* 622 N.E.2d at 924 (quoting *Matter of Adoption of Thomas,* 431 N.E.2d 506, 513 (Ind.Ct.App.1982)). As a result of the adoption, the adopted child becomes the legal child of the adoptive

parent. *T.B.*, 622 N.E.2d at 924. Probate courts have exclusive jurisdiction over all adoption matters. I.C. § 31–19–1–2. Thus, juvenile courts have no authority to create permanent parent-child ties through adoption or to rule on any other adoption matters.

As noted above, comity comes into play only where there is precise or substantially similar identity of parties, subject matter, and remedies in the competing actions. *Thacker*, 785 N.E.2d at 625. Here, we have the following parties: (1) in the CHINS case, OFC was the petitioner, M.A.H.'s birth mother was the respondent, a CASA was appointed for M.A.H., and an attorney was appointed for the unknown father; (2) in the TPR case, OFC was the petitioner, the CASA appeared as a party, and the unknown father was represented by counsel; and (3) in the adoption case, the Parents were petitioners and, as noted above, we have concluded that OFC was a party, albeit somewhat unofficially. Thus, while OFC was involved in all cases, the Parents were not.

OFC argues that the Parents should have sought to intervene in the TPR case to contest Judge Hanson's November 19 order. We agree with the Parents, however, that it is highly unlikely that they would have been permitted to intervene in a TPR action to pursue issues related to their own prospective adoption, especially in response to an interlocutory order in which termination was taken under advisement and no actual plan of care and placement had been approved. Under these circumstances, there is not a sufficient identity of parties between the CHINS case and the adoption case to invoke comity. Moreover, as noted above, TPR, CHINS, and adoption cases have divergent subject matter and remedies. Accordingly, even if OFC had not waived its

argument regarding comity, it would not succeed on this basis.

■■■■ As to the Probate Court's jurisdiction over the adoption case, we first restate that probate courts have exclusive jurisdiction over all adoption proceedings. I.C. § 31–19–1–2. That there is a simultaneous CHINS and/or TPR proceeding does not in any way divest the probate court of its exclusive jurisdiction. But a concurrent TPR proceeding seems, at first blush, to complicate the analysis, inasmuch as probate and juvenile courts have concurrent jurisdiction over a TPR proceeding. I.C. § 31–35–2–3. Nevertheless, it is apparent to us that the consent statute, Indiana Code section 31–19–9–1, disentangles this ostensible jurisdictional knot. Pursuant to the consent statute, although a probate court retains exclusive jurisdiction over an adoption case, OFC— which, during the pendency of a TPR proceeding, is the child's legal guardian— must be given an opportunity to consent to the adoption. I.C. § 31–19–9–1(a)(3). If OFC refuses to consent to the adoption, the probate court must determine whether OFC was acting in the best interests of the child in withholding its consent. I.C. § 31–19–9–8(a)(10); *see also In re Adoption of L.C.*, 650 N.E.2d 726, 729–30 (Ind. Ct.App.1995). Ultimately, we are persuaded that the consent statute enables the probate court to retain exclusive jurisdiction over an adoption proceeding even as it respects the opinion of OFC, which is the child's legal guardian and petitioner in the simultaneous TPR proceeding.

Next, we turn to the two primary cases upon which the parties rely as support for their respective positions. First, the Parents direct our attention to *T.B.*, in which our Supreme Court considered an adoptive mother who sought revocation of the adoption pursuant to Trial Rule 60(B), claiming that the Lake County Division of Family

and Children's Services had made a material misrepresentation about the child. Previously, the county had instituted a CHINS action in juvenile court. The county argued that the probate court lacked jurisdiction to revoke the adoption while the juvenile court exercised jurisdiction over the pending CHINS matter. Our Supreme Court disagreed, observing the distinction between adoption and CHINS proceedings:

> An action for adoption and a CHINS proceeding, however, are separate actions which affect different rights.... The juvenile court was expressly given jurisdiction over CHINS proceedings and, similarly, a court with probate jurisdiction was expressly given jurisdiction over adoption matters. The power to adjudicate either matter does not divest the other court of its respective jurisdiction. *Consequently, a court with probate jurisdiction may adjudicate an adoption matter simultaneously with the juvenile court's adjudication of a CHINS proceeding.*

622 N.E.2d at 924 (emphasis added).

While we acknowledge the compelling nature of the emphasized language in the above quotation, it is apparent that *T.B.* is eminently distinguishable from the case at hand, inasmuch as it involves revocation of a previously-granted adoption. That is a wholly different factual setting than that presented by M.A.H.'s situation. Moreover, our Supreme Court did not address the consent statute in *T.B.*, presumably because that was not at issue in the case. Consequently, *T.B.* does not affect our analysis of the issue.

OFC, on the other hand, argues that this court's decision in *Adoption of E.B.* should control the outcome of this case. 733 N.E.2d 4 (Ind.Ct.App.2000), *trans. denied.* In *E.B.*, the child's foster parents filed a petition to adopt her in probate court.

But there was a pending CHINS action in juvenile court, and the goal of that action was to reunite E.B. with her biological father. The *E.B.* court concluded that the probate court properly denied the foster parents' petition because "the CHINS proceeding ... was directed at reunifying the father and daughter. [Also], the adoption proceeding involved a third party attempting to adopt a child when her father's parental rights had never been terminated." *Id.* at 6.

While we believe that the outcome in *E.B.* is correct, we are of the opinion that the better way to have resolved the case would have been to look to the consent statute rather than the respective goals of the pending actions. Thus, OFC could have withheld its consent, and if the probate court believed that the consent was unreasonably withheld, we could have reviewed the decision for reasonableness. Accordingly, we do not find *E.B.* to be persuasive on this issue.

In sum, we conclude that comity did not prevent the Probate Court from exercising its jurisdiction over M.A.H.'s adoption. Moreover, the mere fact that there were pending CHINS and TPR proceedings did not in any way divest the Probate Court of its exclusive jurisdiction over the Adoption Case, inasmuch as the consent statute enabled OFC, as M.A.H.'s legal guardian and as petitioner in the TPR Case, to voice its concerns and opinions about the Parents' petition to adopt. Thus, we conclude that the Probate Court properly exercised jurisdiction over the Parents' joint petition to adopt M.A.H.

### C. Adoption Act

Next, we turn to OFC's argument that the Probate Court erred in granting the Parent's petition because the Indiana Adoption Act does not permit an

unmarried couple to adopt.[7] As we consider this argument, we observe that statutory construction is a matter of law reserved for the court and is reviewed de novo. *Vanderburgh County Election Bd. v. Vanderburgh County Democratic Central Comm.*, 833 N.E.2d 508, 510 (Ind.Ct.App. 2005). The cardinal rule of statutory construction is that if a statute is unambiguous, then we need not and cannot interpret it; rather, we must apply its plain and clear meaning. *Id.*

Indiana Code section 31–19–2–2(a) provides that "a resident of Indiana" may file a petition to adopt a child under the age of eighteen. The Adoption Act also includes certain rules that are specific to married petitioners:

(a) Except as provided in subsection (b), a petition for adoption by a married person may not be granted unless the husband and wife join in the action.

(b) If the petitioner for adoption is married to the:

(1) biological; or

(2) adoptive;

father or mother of the child, joinder by the father or mother is not necessary if an acknowledged consent to adoption of the biological or adoptive parent is filed with the petition for adoption.

I.C. § 31–19–2–4.

It is a well-settled rule of statutory construction that words used in their singular also include their plural. *Medley v. Am. Economy Ins. Co.*, 654 N.E.2d 313, 314 (Ind.Ct.App.1995); *see also* Ind.Code § 1–1–4–1 (providing that "[w]ords importing the singular number only may be also applied to the plural of persons and things"). Thus, the Parents argue—and the Probate Court agreed—that statutory language permitting "a resident of Indiana" to file a petition for adoption does not limit it to a singular resident, but rather includes the plural—"residents"—as well. Upon examining the statute regarding adoption by married couples, it is apparent to us that the General Assembly intended "a resident" to include the plural. And of course, the State does not argue that married couples—necessarily constituting more than one resident—may not adopt. Accordingly, there is nothing in Indiana Code section 31–19–2–2 that limits the Parents' right to adopt M.A.H.[8]

OFC next turns to Indiana Code section 31–19–2–4, which puts rules in place regarding adoption by married couples. OFC argues that this statute shows that "two individuals may join in a single petition only if they are married." OFC Appellant's Br. p. 14. According to OFC, "the Indiana legislature has rejected joint parentage outside of marriage." *Id.* But OFC cannot point to any statutory language explicitly in support of that conclusion. And, indeed, the purpose of requir-

---

**7.** In the past, we have observed the benefits of a two-parent, as opposed to a one-parent, adoption:

A two-parent adoption enables a child to be raised in a stable, supportive, and nurturing environment and precludes the possibility of state wardship in the event of one parent's death. Such an adoption also legally entitles the child to both parents' employer-and/or government-sponsored health and disability insurance; education, housing, and nutrition assistance; and social security benefits.

*M.M.G.C.*, 785 N.E.2d at 270.

**8.** The dissent notes that this rule of statutory construction is permissive rather than mandatory. But while the State and the dissent conclude that certain types of couples may not adopt, neither the State nor the dissent argue that married couples are precluded from adopting. Consequently, everyone—including the dissent—agrees that the singular "resident" necessarily includes the plural as well.

ing married persons to petition jointly for adoption is well recognized. It is specific to the marital relationship and its attendant legal obligations:

In the case of unmarried petitioners, there may exist no other individual in the household in whom resides the responsibilities of maintaining that household. As for married petitioners, the reasonable presumption exists that both spouses live together with concurrent powers of decision-making and concurrent household responsibilities. The decision by one spouse to adopt, without the other's participation, could reasonably lead to such a state of dissension over not only responsibility for the child, but also over support and/or heirship, that the household is no longer one the sovereign would find desirable for purposes of adoption. "[T]he public policy embodied in such a requirement is readily appreciated. It is to guarantee harmony on the part of the adoptive parents upon the question of adoption, and to assure a welcome and affectionate reception of the child into its adoptive home." *In re Bresnehan's Will,* (1936) 221 Wis. 51, 64, 265 N.W. 93, 99. . . .

This policy of requiring the spouse to join in the adoption petition or, at the very least, to consent to such petition appears to be widely embraced.

*Browder v. Harmeyer,* 453 N.E.2d 301, 307 (Ind.Ct.App.1983) (citations and footnotes omitted).

It is apparent to us that in enacting this statute, the legislature was requiring married persons to petition jointly for the above-described reasons. But it does not follow that in placing this requirement upon a married couple, the legislature was simultaneously denying an unmarried cou-

ple the right to petition jointly. Indeed, contrary to OFC's arguments, there is nothing in the Adoption Act that suggests that to have been the legislature's intent. OFC does not argue that the section regarding married petitioners in any way affects the right of individuals to adopt; similarly, we do not believe that it affects the right of unmarried couples to adopt. Accordingly, we conclude that under the Indiana Adoption Act, an unmarried couple may file a joint petition to adopt a minor child.[9]

The dissent concludes that the General Assembly has evinced an intent to preclude unmarried couples from filing joint petitions to adopt. The central issues in the cases relied upon by the dissent include the following: whether a second adoptive parent may adopt a child without divesting the rights of the first adoptive parent, *In re Adoption of M.M.G.C.,* 785 N.E.2d 267 (Ind.Ct.App.2003); whether the parental rights of a biological mother are divested by the second-parent adoption of the mother's children by her domestic same-sex partner, *In re Adoption of K.S.P.,* 804 N.E.2d 1253 (Ind.Ct.App.2004); and whether an adoptive mother is entitled to vacate the adoption and withdraw support from her children after her relationship with the biological mother had ended, *Mariga v. Flint,* 822 N.E.2d 620 (Ind.Ct. App.2005), *trans. denied.* These cases are not the "elephants in the room," inasmuch as their subject matter—second-parent adoption—is completely different from and unrelated to that presented in the case before us.

Moreover, *M.M.G.C., K.S.P.,* and *Mariga* all specifically relate to the rights and responsibilities of homosexual people as

---

9. We also observe that should anyone be concerned about a "slippery slope" resulting from this conclusion, any petitioner(s) seeking to adopt a child must still establish for the probate court that the adoption would be in the child's best interests.

adoptive parents. But the issue presented herein is far broader than that, and, in fact, is not in any way limited by or related to the sexual orientation of would-be adoptive parents. Indeed, even Judge Hanson insisted that his ruling had nothing to do with the fact that the Parents are both women, emphasizing more than once that he would have come to the same conclusion even if they had been a heterosexual unmarried couple.

And while it may be true that the General Assembly has spoken regarding second-parent adoption, there is simply nothing in the Adoption Act suggesting that it intends to preclude all unmarried couples from adopting. The dissent concludes that the controlling issue in this case

> is not whether this case is about a second-parent adoption or a joint adoption but the marital status of the petitioners.... It defies logic and reason, and would render the 2005 amendment virtually meaningless, for the Adoption Act to disallow a sequential adoption by an unmarried couple but allow a simultaneous adoption by the same unmarried couple.

Op. p. 250. The simple truth, however, is that the legislature has *not* amended the Adoption Act to affect, in any way, the ability of an unmarried couple to file a joint petition to adopt. The statute is silent on that issue. Thus, our conclusion does not permit joint petitioners to "avoid[ ]," Op. p. 250, the 2005 amendment, inasmuch as it plainly, on its face, does not affect their rights in any way. Furthermore, the supposed connection between the legislature's pronouncement regarding second-parent adoption and the ability of an unmarried couple to file a joint petition to adopt is tenuous at best, and far from sufficient to glean a legislative intent to bar the practice altogether. Consequently, we cannot agree with the dissent's position.

■■■■ We observe that one of the bases for the Juvenile Court's November 19 order was Judge Hanson's understanding of the policies of Morgan County, i.e., that non-hard-to-place children must be adopted by a married couple. But county courts must be guided by state law rather than local practice in carrying out their duties: "[a] general statute, enacted by the people of the entire state through their representatives, speaks for and to the whole population, and therefore cannot be given or be supposed to have a merely local meaning, or a meaning varying to suit the special usage prevailing in the several localities." *Cook v. State*, 26 Ind.App. 278, 281–82, 59 N.E. 489, 490 (Ind.Ct.App. 1901). In fact, "[u]niformity in the interpretation and application of the law is the keystone in our system of jurisprudence." *Warren v. Ind. Tel. Co.*, 217 Ind. 93, 108, 26 N.E.2d 399, 405 (Ind.1940). Accordingly, the Juvenile Court—and, indeed, all local courts—must base its decisions on state law, and must also ensure that local practice complies with state law.

■■■ Having concluded that the Probate Court properly exercised jurisdiction over the Parents' joint petition and that the petition is not barred by the Adoption Act, we will now briefly consider whether Judge Dieter properly granted the petition over OFC's refusal to consent. Because OFC was M.A.H.'s guardian, its consent would normally have been required, but if, as here, the Probate Court concludes that the reasons for its refusal to consent are not in the best interests of the child, then OFC's consent is not necessary. I.C. § 31–19–9–1(a)(3), –8(a)(10). As noted above, all involved parties, including the CASA, the biological mother, the Parents, and even OFC, believed that the Parents' adoption of M.A.H. was in the child's best interests. Indeed, even Judge Hanson

agreed that the Parents have been more than equal to the task of parenting:

> there is one truth I'm sure of since the beginning of this case and first perked my interest is the fact that this child no doubt loves you and there no doubt has been a strong bond develop[ed] between the three of you, I have no doubt about that. Further, from every report I have received the information I have got[ten] from the CASA, their attorney, the OFC and then from your attorneys as well. *No question has ever been raised about your fitness particularly or your ability to care for this child, nor has [sic] there ever been issues raised regarding the love that you have for this child.*

OFC App. p. 12 (emphasis added). OFC made it clear to the Juvenile Court that the *only* reason it was withholding consent was because it felt bound to do so by Judge Hanson's November 19 order. By *all* accounts, including OFC's, this is a loving, supportive, happy home where M.A.H. has been thriving since she began living there when she was two days old. Under these circumstances, it is apparent that the Probate Court properly granted the Parents' joint petition for adoption.

## II. The CHINS Case

Having determined that the Probate Court properly granted the petition for adoption, we must now consider whether the Juvenile Court properly refused to dismiss the CHINS proceeding, ordered M.A.H. to be placed with the adoptive family consisting of a married couple, and ordered the biological mother to locate relatives who might be willing to care for M.A.H.

A child under the age of eighteen is a CHINS if:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability,

refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind.Code § 31–34–1–1. Furthermore, "[w]hen the juvenile court finds that the objectives of the dispositional decree have been met, the court *shall* discharge the child and the child's parent/guardian or custodian." I.C. § 31–34–21–11 (emphasis added).

Here, the dispositional goal for M.A.H. in the CHINS case was "[a]doption." Parents' App. p. 90; *see also* I.C. § 31–34–21–7.5(c) (providing that a permanency plan for CHINS cases may include placement of the child for adoption). At the time the Parents filed their motion to dismiss the CHINS action, M.A.H. had been adopted. Thus, the dispositional goal had been met. Moreover, M.A.H. no longer meets the statutory standard for a CHINS, inasmuch as there is universal agreement that M.A.H. has been well cared for by the Parents since she was two days old. Under these circumstances, the Juvenile Court was statutorily required to dismiss the CHINS case. *See Shepherd v. Carlin*, 813 N.E.2d 1200, 1203 (Ind.Ct.App. 2004) (holding that "shall" connotes mandatory obligation unless clearly demonstrated otherwise).

Apparently, the Juvenile Court relied upon its opinion that the Probate Court lacked jurisdiction to grant the adoption and upon the fact that there was still time for OFC to appeal or otherwise directly challenge the adoption decree. As noted

above, however, we have concluded that the Probate Court properly granted the adoption. Moreover, Judge Hanson's unqualified statutory obligation to discharge its CHINS jurisdiction is not tolled by possible or actual appeals of an adoption decree that remains in force. If a direct appeal of an adoption decree is ultimately successful and results in the adoption being set aside, OFC is free to initiate a new CHINS action if warranted. But the juvenile court in such a situation is still required to dismiss the pending CHINS action. Accordingly, we find that the Juvenile Court erred in refusing to dismiss the CHINS petition.

Additionally, we note that the Juvenile Court erred in treating the Probate Court's adoption decree as void. A final judgment of a court with subject matter and personal jurisdiction over the parties, even if "irregular, is not void and not impeachable collaterally." *Mishler v. County of Elkhart*, 544 N.E.2d 149, 151 (Ind.1989). As noted above, probate courts have subject matter jurisdiction over all adoptions, and another court may not treat their orders as void simply because their actions are called into question. *Matter of Adoption of H.S.*, 483 N.E.2d 777, 780 (Ind.Ct.App.1985). Moreover, there has never been any suggestion that the Marion Probate Court did not have personal jurisdiction over these parties. The proper remedy was timely objection and direct appeal by litigants in the Adoption Action, not treating the adoption decree as void in the CHINS case. Accordingly, we conclude that the Juvenile Court erred in refusing to honor the Probate Court's adoption decree.

OFC contends that all issues surrounding the Juvenile Court's actions in the CHINS case are moot, inasmuch as Judge Hanson informed the parties that if the adoption decree was reversed by this court, he would not remove M.A.H. from the Parents' custody and would allow one, but not both, of them to adopt her. But he did not enter an order containing those assurances. Furthermore, the Juvenile Court did not vacate the interlocutory orders to continue the CHINS action and to remove M.A.H. from her Parents' home. We also note that even if none of these problems existed, the Juvenile Court still only promised that he would allow one, not both, of the Parents to adopt M.A.H. As noted above, there are significant advantages to a joint adoption, and while it is true that if one of the Parents adopted M.A.H., they would at least be able to remain together as a family, it would fall far short of the ultimate remedy they are seeking. Under these circumstances, it is clear that the issues surrounding the CHINS case are far from moot.

Finally, for clarity's sake, we will address the termination of the biological parents' rights. Although the Juvenile Court initially terminated the birth mother's parental rights, it then rescinded that termination and has since refused to rule on the matter. In granting the Parents' petition for adoption, however, the Probate Court terminated the parental rights of M.A.H.'s biological mother and father. Her birth mother has maintained consistently since M.A.H.'s birth that she wants to terminate her parental rights. Furthermore, M.A.H.'s biological mother agreed to the adoption by the Parents. And the Probate Court found that the biological father's rights were terminated because of his failure to register with the putative father registry, which operates as an irrevocably implied consent to the adoption. Although those decisions have not been called into question, we summarily affirm the Probate Court's termination of the parental rights of M.A.H.'s biological mother and father.

## CONCLUSION

In sum, we have determined that the Marion Probate Court properly exercised jurisdiction over the adoption case and properly granted the Parents' joint petition for adoption. We have also concluded that the Morgan Juvenile Court erred in refusing to dismiss the CHINS case and in treating the adoption decree as void.

We affirm the judgment of the Marion Probate Court.

We reverse the judgment of the Morgan Juvenile Court and remand with instructions to dismiss the CHINS and TPR cases.

VAIDIK, J., concurs.

NAJAM, J., dissents with opinion.

NAJAM, Judge, dissenting.

I respectfully dissent. The Adoption Act neither authorizes nor permits a joint petition for adoption by unmarried petitioners. I would hold that Indiana law does not allow an unmarried couple, regardless of their gender or sexual orientation, to file a joint petition to adopt a minor child.

By all accounts, the foster parents in this case are well qualified to raise the infant child. The Morgan County Department of Family and Children recommended that the adoption be approved. The Marion County probate court agreed, finding that "Petitioners love and care for one another as parents do in an appropriate family unit." Parents' App. at 95.

But, as the majority notes, adoption law is entirely statutory. Adoption was unknown under the common law. *In re Perry*, 83 Ind.App. 456, 148 N.E. 163, 166 (1925). Thus, cases interpreting our adoption statutes are not common law cases but judicial interpretations of statutes enacted by our legislature. The primary goal in statutory construction is to determine, give effect to, and implement the intent of the legislature. *State v. Dugan*, 793 N.E.2d 1034, 1036 (Ind.2003). The cardinal rule of statutory construction is that the "[w]ords are to be given their plain, ordinary, and usual meaning, unless a contrary purpose is shown by the statute itself." *Id.* In interpreting a statute, it is just as important to recognize what the statute does not say as it is to recognize what it does say. *Id.*

This court has issued a number of opinions that are related to the case at hand. In *In re Adoption of M.M.G.C.*, 785 N.E.2d 267 (Ind.Ct.App.2003), the question presented was whether a second adoptive parent may adopt a child without divesting the rights of the first adoptive parent. A panel of this court noted that the Indiana statutory law then in effect did not "expressly divest the rights of an adoptive parent in the event of a second-parent adoption" and acknowledged that "neither does [Indiana statutory law] expressly permit two unmarried adults to simultaneously exercise these rights with respect to an adoptive child." *Id.* at 270. Thus, the panel "determined that the adoption statutes do not specifically address the issue in this case" but held that "Indiana's common law permits a second parent to adopt a child without divesting the rights of the first adoptive parent." *Id.* In *M.M.G.C.*, we acknowledged that:

> We do not reach the question of whether a second-parent adoption would divest all rights of a biological parent with respect to the child where the child's prospective adoptive parent and the child's biological parent are not married to each other. *Neither do we reach the question of whether two unmarried adults may adopt a child by filing a joint petition for adoption.*

*Id.* (emphasis added).

Next, in *In re Adoption of K.S.P.*, 804 N.E.2d 1253 (Ind.Ct.App.2004), we consid-

ered the first of the two questions not decided in *M.M.G.C.*, namely, whether the parental rights of a biological mother are divested by the second-parent adoption of the mother's children by her domestic same-sex partner. The trial court denied the domestic partner's petition, holding that such an adoption would terminate the biological mother's parental rights pursuant to Indiana Code Section 31–19–15–1. We rejected a "strict literal reading" of the relevant statutes and reversed, concluding that "the legislature could not have intended such a destructive and absurd result," *K.S.P.*, 804 N.E.2d at 1257, and that "Indiana law does not require a destructive choice" between the prospective adoptive parent and the biological parent where both are in fact acting as parents, *Id.* at 1260.

Then, in *Mariga v. Flint*, 822 N.E.2d 620 (Ind.Ct.App.2005), *trans. denied*, the adoptive mother had adopted the children of the biological mother pursuant to the stepparent adoption statute. *See* Ind.Code § 31–19–15–2. When the women separated, the biological mother sought child support from the adoptive mother. The adoptive mother then sought to vacate the adoption, contending that *K.S.P.* was wrongly decided and, in any event, that it should not be applied retroactively. She argued further that there is no statutory authority for her to adopt the children. The *Mariga* court noted that "the precedent for same-sex couple adoption" had already been set, citing *M.M.G.C.*, 785 N.E.2d at 270, and, following the precedent of *M.M.G.C.* and *K.S.P.*, the court held that the adoptive mother's adoption of the biological mother's children was "valid and proper," *Id.* at 628.[10]

This case presents the question that none of the previously cited adoption cases have addressed, namely, whether two unmarried adults may adopt a child by filing a joint petition for adoption. Thus, the majority dismisses these cases altogether, characterizing their subject matter as "completely different from and unrelated to that presented in the case before us." Op. at 243. I cannot agree. While these cases are not controlling, they are all related to the subject matter of this case, namely, adoptions by unmarried individuals. These cases are not only relevant to our inquiry, but they are also the "elephants in the room." As discussed below, these cases are the precursors to the 2005 amendment to the Act.

At oral argument the State categorically asserted that *M.M.G.C.*, *K.S.P.*, *Mariga*, and *King v. S.B.*, 818 N.E.2d 126 (Ind.Ct. App.2004), *vacated by transfer, superseded by* 837 N.E.2d 965 (Ind.2005), were wrongly decided. We need not consider whether these cases are irrelevant, as the majority suggests, or whether these cases were "wrongly decided," as the State contends, because the legislature has enacted a statute that largely negates their operation and effect. In 2005, the legislature clearly responded to these cases with an amendment to the Act which underscores its intent that when a child has two adoptive parents, the parents must be married to each other.

Legislative intent is sometimes difficult to discern, but not in this instance. The legislature's amendment of a statute is indicative of the legislature's intent at the initial enactment of the statute. *Tedlock v.*

---

10. I would have concurred in *Mariga* on the grounds that the appellant had initially sought to be a parent and was, therefore, estopped from repudiating her parental obligations. *See, e.g., Levin v. Levin*, 645 N.E.2d 601, 604 (Ind.1994) (holding father of child conceived through artificial insemination using donor's semen was equitably estopped from denying his child support obligation).

*State,* 656 N.E.2d 273, 276 (Ind.Ct.App. 1995). Here, in response to *M.M.G.C., K.S.P., Mariga,* and *King v. S.B.,* 818 N.E.2d 126, the 2005 session of the Indiana General Assembly amended the stepparent adoption statute to make it clear that the "divesting" provision of Indiana Code Section 31–19-15–1 does, indeed, apply to stepparent adoptions when the first and second parents are not married to each other and neither is the biological parent. The new Indiana Code Section 31–19-15–2(b), approved May 4, 2005, and effective July 1, 2005, provides: "If the adoptive parent of a child is *married* to a previous adoptive parent, the parent-child relationship of the previous adoptive parent is not affected by the adoption." (Emphasis added). This new subsection 2(b) is the natural corollary to subsection 2(a), which provides a stepparent exception to divestiture when the adoptive parent is married to a biological parent of the child.

Indiana Code Section 31–19-15–2(b) is the legislature's response to *M.M.G.C.* and its progeny. This provision contains a negative pregnant, i.e., a negative statement that also implies an affirmative statement. Here, the negative statement that if adoptive parent B is married to previous adoptive parent A, then the parent-child relationship of A is not affected also means that if adoptive parent B is *not* married to previous adoptive parent A, then the parent-child relationship of A *is* affected. This is the same manner in which subsection 2(a) is written and has been interpreted. *See King v. S.B,* 837 N.E.2d 965, 968 (Ind.2005).

As Justice Dickson has noted, the Indiana legislature has determined the persons eligible and the procedures to be followed when a person not a child's parent wishes to become the child's legal parent. *King,* 837 N.E.2d at 968 (Dickson, J., dissenting).[11] Indiana adoption law expressly addresses stepparent adoptions, permitting them "if 'the adoptive parent of a child is *married* to a biological parent of a child.'" *Id.* (quoting Ind.Code § 31–19-15–2(a)) (emphasis in original). In all other cases, an adoption operates to divest the child's parents of all rights with respect to the child. Ind.Code § 31–19-15–1; *King,* 837 N.E.2d at 968. Stepparent adoptions require the adoptive parent to be married to the child's parent. *King,* 837 N.E.2d at 968. The 2005 amendment validates Justice Dickson's reasoning.

The majority contends that the 2005 amendment "does not affect [joint petitioners'] rights in any way." Op. at 244. But this amendment is the most recent expression of legislative intent on the question of adoption by unmarried couples and was enacted only within the last year. It cannot be ignored.

In *K.S.P.,* this court allowed a same-sex adoption by invoking the "stepparent exception" under Indiana Code Section 31–19-15–2. *See K.S.P.,* 804 N.E.2d at 1259. But the 2005 amendment makes it clear that the "stepparent exception" to divestiture does not apply to sequential adoptions by unmarried couples. The majority states that "the supposed connection between the legislature's pronouncement regarding second-parent adoption and the ability of an unmarried couple to file a joint petition to adopt is tenuous at best," presumably because the petitioners in this case did not seek a second-parent adoption but filed a joint petition. Op. at 244.

**11.** In *King,* the majority did not address the merits of the appeal but reversed the trial court's dismissal of the petitioner's complaint under Indiana Trial Rule 12(B)(6) and remanded to the trial court for further proceedings.

But the controlling issue is not whether this case is about a second-parent adoption or a joint adoption but the marital status of the petitioners. The stepparent provision, Indiana Code Section 31–19–15–2, and the general adoption provision, Indiana Code Section 31–19–2–2, must be construed together. It defies logic and reason, and would render the 2005 amendment virtually meaningless, for the Adoption Act to disallow a sequential adoption by an unmarried couple but allow a simultaneous adoption by the same unmarried couple. It is a basic principle of statutory construction that when two statutes deal with the same subject matter in different terms, the latest expression of legislative intent controls. *Schrenger v. Caesars Ind.*, 825 N.E.2d 879, 881 (Ind.Ct.App. 2005), *trans. denied.*

We will not interpret a portion of a statute to be meaningless if it can be reconciled with the rest of the statute. *Unincorporated Operating Div. of Ind. Newspapers v. Trs. of Ind. Univ.*, 787 N.E.2d 893 (Ind.Ct.App.2003). Thus, the Act must be construed as a whole, *see Blasko v. Menard, Inc.*, 831 N.E.2d 271 (Ind.Ct. App.2005), *trans. denied,* and the sections of the Act must be read together, *City of North Vernon v. Jennings Northwest Reg'l Utils.*, 829 N.E.2d 1, 4 (Ind.2005). Under our rules of statutory construction, it cannot be presumed the General Assembly intended language used in a statute to be applied in an illogical manner. *State ex rel. Hatcher v. Lake Super. Ct., Rm. Three,* 500 N.E.2d 737, 739 (Ind.1986). Nor can it be presumed the legislature intended to do an absurd thing or to enact a statute that has useless provisions, the effect of which can easily be avoided. *Id.*

Here, the 2005 amendment provides that an adoption by a second parent divests a previous adoptive parent of his or her parental rights if the two are not married, thus precluding sequential adoptions by an unmarried couple. It must follow that the legislature also intended to preclude unmarried couples from filing joint petitions to adopt. This construction harmonizes the amendment with the Act. Again, it would be absurd to preclude a sequential adoption by an unmarried couple while authorizing a simultaneous adoption by the *same* unmarried couple. By ignoring the amendment, the majority opinion guts the amendment and renders it useless in that, under the majority's interpretation, the amendment can easily be avoided by filing a joint petition. *See id.*

Indiana Code Section 31–19–15–2(b) is not artfully drafted, but it is the legislature's most recent pronouncement on the effect of second-parent adoptions on parental rights. In the enactment of this provision, the legislature's purpose and intent is unmistakable, namely, that sequential adoptions by unmarried persons are not permitted and that an adoption by a second adoptive parent will divest the first adoptive parent of his or her parental rights and responsibilities. Indeed, the term "adoptive parent" in the statute is gender neutral, but the terms "adoptive father" and "adoptive mother" are not. There is nothing in the statute that suggests that these gender-specific terms are interchangeable and that father means mother or mother means father. Rather, Indiana Code Section 31–19–15–2(c) describes "the adoptive father or the adoptive mother, or both[.]" Thus, "both" means the adoptive father *and* the adoptive mother. The statute clearly does not contemplate an adoption with two adoptive fathers or two adoptive mothers.

As the majority observes, Indiana Code Section 31–19–2–2(a) provides that a "[a] resident of Indiana" may file a petition to adopt a child under the age of eighteen. The majority summarily concludes that as

a matter of course words used in their singular also include the plural. But, as the majority also notes, Indiana Code Section 1–1–4–1 provides that "[w]ords importing the singular number only *may* be also applied to the plural of persons or things." (Emphasis added.) This rule of statutory construction contains the word "may" rather than the word "shall". The rule is permissive, not mandatory, and does not in itself resolve the question presented in this case.

Our General Assembly has enacted statutes permitting adoptions by single adults,[12] married couples,[13] and stepparents.[14] *M.M.G.C,* 785 N.E.2d at 269. The only joint petitioners mentioned in the Act are married petitioners where the Act provides that "a petition for adoption by a married person may not be granted unless the husband and wife join in the action." *See* Ind.Code § 31–19–2–4. The Act also requires that, for the parent-child relationship to remain intact, stepparents must be married to each other, whether the stepparent is married to a biological parent or to a previous adoptive parent. *See* Ind. Code § 31–19–15–2(a) and (b). These three provisions of the Act make clear that the parents of an adoptive child must be married to each other, whether a husband and wife are joint petitioners, or the petitioner is married to a biological or adoptive father or mother of the child. The marriage requirement is not mere surplusage.

The majority contends that because the Act provides that a husband and wife may petition for an adoption, the singular "resident" necessarily includes the plural as well. The term "necessarily" means under all circumstances, without exception. The majority expands the requirement that both spouses join in an adoption petition far beyond its obvious, limited meaning. This specific requirement, which applies only to married joint petitioners, does not translate into a general authorization for unmarried joint petitioners.

Children need parents, and adoption is an unselfish act that brings parents together with the children who need them. Adoption should be encouraged, both for the good of the parties and for society at large. But adoption is a privilege, not a right. The terms and conditions of adoption represent policy decisions vested in the legislature. It is the legislature's prerogative to establish what policies are to be furthered under the adoption statutes, including whether an unmarried couple may adopt.[15]

It is clear that our legislature has exercised its right to determine that the parents in an adoption must be married to each other. The 2005 amendment to the stepparent adoption statute clearly demonstrates the legislature's intent and trumps the decisions of this court that have approved unmarried couple adoptions. Thus, I respectfully dissent and would reverse the Marion County probate court and remand with instructions to vacate the adoption order. Further, I would affirm the Morgan County trial court's denial of the motion to dismiss the CHINS petition.

**12.** Ind.Code § 31–19–2–2.

**13.** Ind.Code § 31–19–2–4.

**14.** Ind.Code § 31–19–15–2.

**15.** The legislature has many options. For example, the legislature might authorize a brother and sister to adopt a younger sibling or to adopt a niece or nephew who is the child of a deceased sibling.