## In the Matter of the ADOPTION OF Infant K.S.P. and Infant J.P.

### No. 56A03–0309–CV–375.

Court of Appeals of Indiana.

March 23, 2004.

R. Steven Ryan, Barce & Ryan, Kentland, IN, Attorney for Appellant.

---

## OPINION

FRIEDLANDER, Judge.

Monica J. Polchert appeals the denial of her uncontested petition to adopt K.S.P. and J.P., the biological children of her domestic partner, Linda L. Lutz. She presents the following consolidated and restated issue for review: Did the trial court err in denying her petition to adopt the children as a second parent?

We reverse and remand.

J.P., born May 21, 1990, and K.S.P., born January 8, 1993, are the biological children of Linda Lutz (Mother) and John Potat (Father). Mother and Father were legally divorced in October 1994. Mother has retained legal custody of the children since the divorce. While Father has maintained visitation with the children, he has not consistently paid child support and, in addition to being an alcoholic, has been in and out of jail for several years.

On March 5, 2003, Polchert filed an adoption petition with the trial court. Along with the petition, Mother and Father each filed written consents to said adoption. Father's consent expressly provided, in part: "I hereby relinquish all paternal rights with regard to said children and fully acknowledge and understand the legal consequences of my actions and the consent which I have given herein, whereupon the adoption being finalized, my parental rights will be terminated." Appendix at 8.

Thereafter, on May 28, 2003, as required by statute, the Newton County Office of Family and Children (the OFC) filed with the trial court an Adoptive Family Preparation Summary regarding the proposed adoption. An adoption specialist with the

OFC had prepared this report following a home study. The OFC endorsed the proposed adoptions. At the conclusion of its detailed report, the OFC provided the following summary assessment:

Monica Polchert has been an immediate member of the family of Linda Lutz and her two children, [J.P. and K.S.P.], for seven years. Monica has provided the love, support, and day-to-day care that any involved parent would. Monica and Linda want this adoption to ensure that all of these things will continue in the event that any unforeseeable happening would leave the children without their mother. The adoption would also allow the children to be insured through Monica.

It is evident that the decision to petition for the adoption of these children has been made with the best interest of the children in mind and with serious thought and planning on the part of their mother, Linda Lutz and her partner, Monica Polchert.

*Id.* at 17.

The trial court held a final hearing on the uncontested adoption petition on July 9, 2003. Polchert and Mother testified at the hearing, explaining that they wished to share parental rights. They expressed that the children needed stability, which they had not received from their relationship with Father. Polchert and Mother also urged that the adoption was necessary for legal and medical reasons. In particular, Polchert noted that the adoption would allow the children to receive medical insurance coverage through her employer.[1] At the conclusion of the hearing, the trial court took the matter under advisement.

---

1. At the hearing, Mother testified that the children had no major medical coverage. Polchert explained that, as her domestic partner, Mother was insured through Polchert's place of employment, but the children could not similarly be insured until Polchert obtained legal rights to them.

The following day, the trial court denied Polchert's petition in an order reading in relevant part as follows:

> Comes now the Court, having previously taken this matter under advisement, now finds and Orders as follows:
>
> 1. I.C. 31–19–15–1 provides, in pertinent part, that if the biological parents of a person are alive the biological parents are divested of all rights with respect to the child after the adoption.
>
> 2. I.C. 31–19–15–2 provides that if the adoptive parent of a child is married to a biological parent of the child, the parent child relationship of the biological parent is not effected [sic] by the adoption as the same is set out in I.C. 31–19–15–1.
>
> 3. In this cause, Petitioner is not married to either the biological mother or biological father.
>
> 4. From the testimony of the Parties, it is clear that all Parties are desirous of Petitioner adopting the children here at issue without effecting [sic] the parental rights of the biological mother.
>
> 5. Since I.C. 31–19–15–2 protects the rights of the biological mother only if she is married to Petitioner, the Court cannot grant the relief requested by Petitioner.
>
> THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Petition for Adoption filed by Petitioner is hereby DENIED.

*Appendix* at 3. Polchert filed a motion to correct error on August 7, 2003, which the trial court subsequently denied. Polchert now appeals, arguing that the trial court erred in denying her petition to adopt J.P. and K.S.P. as a second parent.

 On review, we will not disturb a trial court's ruling in adoption proceedings unless the evidence would lead to but one conclusion and the trial court reached the opposite conclusion. *Adoption of M.M.G.C.*, 785 N.E.2d 267 (Ind.Ct.App. 2003). We owe no deference, however, to a trial court's legal conclusions. *Id.*

In *Adoption of M.M.G.C.*, 785 N.E.2d 267, we recently confronted the issue of second-parent adoption in a slightly different context. In that case, the petitioner sought to adopt the adoptive children of her domestic partner. We observed that Indiana statutory law does not require that the rights of an adoptive parent with respect to the child be divested in the event of a second-parent adoption. We contrasted this with a situation involving a biological parent, noting that Ind.Code Ann. § 31–19–15–1 (West 1998) provides that an adoption divests all rights of a biological parent with respect to a child except in the case of a stepparent adoption. Concluding that statutory law did not specifically address the issue presented,[2] we proceeded to look to the common law:

> The right of adoption was unknown at common law. Our General Assembly has since enacted statutes permitting adoptions by married couples, stepparents, and single adults. With respect to these statutes, we have noted that the primary concern in every adoption proceeding is the best interest of the child. "The state has a strong interest in providing stable homes for children. To this end, early, permanent placement of children with adoptive families furthers

---

**2.** "While Indiana statutory law does not expressly divest the rights of an adoptive parent in the event of a second-parent adoption, neither does it expressly permit two unmarried adults to simultaneously exercise these rights with respect to an adopted child." *Adoption of M.M.G.C.*, 785 N.E.2d at 270.

the interests of both the child and the state." A two-parent adoption enables a child to be raised in a stable, supportive, and nurturing environment and precludes the possibility of state wardship in the event of one parent's death. Such an adoption also legally entitles the child to both parents' employer-and/or government-sponsored health and disability insurance; education, housing, and nutrition assistance; and social security benefits. Undoubtedly, it would be in the best interest of the three children in the instant case to be entitled to the legal protections and advantages that a two-parent adoption provides.

"The strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs." "We cannot close our eyes to the legal and social needs of our society, and this Court should not hesitate to alter, amend, or abrogate the common law when society's needs so dictate." We note, however, that "such determinations should be consonant with the evolving body of public policy adopted by the General Assembly." *Consonant with our General Assembly's policy of providing stable homes for children through adoption, we conclude that Indiana's common law permits a second parent to adopt a child without divesting the rights of the first adoptive parent. Allowing a second parent to share legal responsibility for the financial, spiritual, educational, and emotional well-being of the child in a stable, supportive, and nurturing environment can only be in the best interest of that child.*

*Adoption of M.M.G.C.,* 785 N.E.2d at 270–71 (citations omitted) (emphasis supplied).

We expressly limited our holding in *Adoption of M.M.G.C.,* noting that we were not reaching "the question of whether a second-parent adoption would divest all rights of a biological parent with respect to the child where the child's prospective adoptive parent and the child's biological parent are not married to each other." *Id.* at 270 n. 1. We are now squarely presented with this issue.

■ In denying the adoption petition in this case, the trial court relied on two statutory provisions concerning the effect of adoption on biological parents. The first, I.C. § 31–19–15–1 (the divesting statute), provides:

> Except as provided in section 2 of this chapter or IC–31–19–16, if the biological parents of an adopted person are alive, the biological parents are:
>
> (1) relieved of all legal duties and obligations to the adopted child; and
>
> (2) divested of all rights with respect to the child; after the adoption.

This statute provides two specific exceptions to the general rule that an adoption divests all parental rights of a living biological parent. One such exception is where postadoption visitation privileges have been granted to the birth parent pursuant to I.C. § 31–19–16–1 et seq. (West 1998).[3] The other exception, which is particularly relevant here, addresses stepparent adoptions and provides:

> (a) If the adoptive parent of a child is married to a biological parent of the child, the parent-child relationship of the biological parent is not affected by the adoption.
>
> (b) After the adoption, the adoptive father or mother, or both:

*See* I.C. § 31–19–16–2.

---

**3.** A trial court may grant postadoption visitation privileges under limited circumstances.

(1) occupy the same position toward the child that the adoptive father or the adoptive mother, or both, would occupy if the adoptive father or adoptive mother, or both, were the biological father or mother; and

(2) are jointly and severally liable for the maintenance and education of the person.

A strict literal reading of these two statutes would seem to support the trial court's determination that if it were to grant Polchert's petition for adoption, Mother's parental rights to her children would be divested, a consequence clearly unintended by the couple. In light of the purpose and spirit of Indiana's adoption laws, we conclude that the legislature could not have intended such a destructive and absurd result.

We begin our analysis of this issue by observing that the guiding principle of statutes governing the parent-child relationship is the best interests of the child. *See, e.g., E.P. v. Marion County Office of Family & Children,* 653 N.E.2d 1026 (Ind. Ct.App.1995) ("parent's constitutionally protected right to raise his or her child . . . must at all times yield to the child's best interest as determined by the courts of this state"); *B.G. v. H.S.,* 509 N.E.2d 214, 217 (Ind.Ct.App.1987) ("[t]he best interests of the child are the primary concern in an adoption proceeding"); *Stout v. Tippecanoe County Dep't of Pub. Welfare,* 182 Ind.App. 404, 411, 395 N.E.2d 444, 448 (1979) ("[t]he paramount consideration in any adoption proceeding is . . . the best interest of the child"). Moreover, Indiana's General Assembly has announced that the policy of this state is to, inter alia, "recognize the importance of family and children in our society" and "strengthen family life by assisting parents to fulfill their parental obligations". Ind.Code Ann. § 31-10-2-1(1) and (4) (West 1998).

The adoption procedure in Indiana "derives from the state's interest in protecting and promoting the welfare of children by expediting their entry into a suitable, stable family unit." *Paternity of Baby Girl,* 661 N.E.2d 873, 877 (Ind.Ct.App.1996).

The process seeks to avoid any subsequent disruptive interference by the natural parent whose rights have been extinguished, and who may pose a threat to the parent-child relationship created by the adoption. Thus, based upon this public policy, an adoption statute should not be so strictly construed as to defeat its purposes.

*Id.* On the other hand, we have observed that the relationship between parent and child is a bundle of human rights of such fundamental importance that adoption statutes, being in derogation of the common law, should be "strictly construed in favor of a worthy parent and the preservation of such relationship." *Adoption of Thomas,* 431 N.E.2d 506, 512 (Ind.Ct.App. 1982). "Thus the liberal construction rule must be tempered by a counterbalancing rule, that is, neither should the adoption statute be so liberally construed that it would destroy the safeguards erected for preservation of family relationships." *Id.* at 512–13; *see also Paternity of Baby Girl,* 661 N.E.2d 873.

The only immediate threat to preservation of family relationships in the instant case is the harsh application of the divesting statute. The obvious purpose of the divesting statute is to shield the adoptive family from unnecessary instability and uncertainty arising from unwanted intrusions by the child's biological family. *See Adoptive Parents of M.L.V. v. Wilkens,* 598 N.E.2d 1054, 1056 (Ind.1992) (in addition to protecting the rights of natural parents to be with their children, Indiana's adoption statutes "operate to protect the children and to shield all involved parties

from unnecessary instability and uncertainty"). This objective, however, is not advanced by application of the divesting statute in situations involving stepparent adoptions or second-parent adoptions, where the biological parent and proposed adoptive parent are both integral members of the proposed adoptive family. In such instances, it would be absurd to fear that the biological parent, here Mother, could "intrude" into her own family. As an oft cited trial court in New York has emphasized regarding this issue, termination of parental rights in the circumstances of this case "would be an absurd outcome which would nullify the advantage sought by the proposed adoption: the creation of a legal family unit identical to the actual family setup." *Adoption of Evan,* 153 Misc.2d 844, 583 N.Y.S.2d 997, 1000 (Sur.Ct.1992). It is clear that the divesting statute, designed as a shield to protect new adoptive families, was never intended as a sword to prohibit otherwise beneficial intrafamily adoptions by second parents. *See In re Jacob,* 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397 (1995).

Similar decisions approving of second-parent adoptions, despite divesting statutes, have been rendered across the country. *See, e.g., Sharon S. v. Superior Ct.,* 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554 (2003); *In re M.M.D.,* 662 A.2d 837 (D.C.1995); *In re Hart,* 806 A.2d 1179 (Del.Fam.Ct.2001); *In re Petition of K.M.,* 274 Ill.App.3d 189, 210 Ill.Dec. 693, 653 N.E.2d 888 (1995); *Adoption of Tammy,* 416 Mass. 205, 619 N.E.2d 315 (1993); *Adoption of Two Children by H.N.R.,* 285 N.J.Super. 1, 666 A.2d 535 (App.Div.1995);

*In re Jacob,* 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397; *Adoption of B.L.V.B.,* 160 Vt. 368, 628 A.2d 1271 (1993). *But see Adoption of T.K.J.,* 931 P.2d 488 (Colo.Ct.App.1996); *Adoption of Luke,* 263 Neb. 365, 640 N.W.2d 374 (2002); *Adoption of Doe,* 130 Ohio App.3d 288, 719 N.E.2d 1071 (1998); *In re Angel Lace M.,* 184 Wis.2d 492, 516 N.W.2d 678 (1994).[4]

We find particularly apt the following observations by the Vermont Supreme Court:

> When the statute is read as a whole, we see that its general purpose is to clarify and protect the legal rights of the adopted person at the time the adoption is complete, not to proscribe adoptions by certain combinations of individuals. Who may adopt is already covered by § 431. [The divesting statute, § 448,] is concerned with defining the lines of inheritance for adoptees.... The statute also terminates the natural parents' rights upon adoption, but this provision anticipates that the adoption of children will remove them from the home of the biological parents, where the biological parents elect or are compelled to terminate their legal obligations to the child. This legislative intent is evidenced by the step-parent exception, which saves the natural parent's rights in a step-parent adoption. The legislature recognized that it would be against common sense to terminate the biological parent's rights when that parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child.

---

**4.** In a lengthy opinion, which included a strong dissent, a majority of the Connecticut Supreme Court held that the state's adoption laws did not permit a child with a natural or adoptive legal parent to be adopted by a second person other than that parent's spouse. *Adoption of Baby Z,* 247 Conn. 474, 724 A.2d 1035 (1999). The Connecticut legislature quickly reacted to this decision by amending existing adoption statutes to specifically allow for second-parent adoptions. *See* Conn. Gen. Stat. §§ 45a–724(a)(2) and (3); 45a–731(5), (6) and (7).

Although the precise circumstances of these adoptions may not have been contemplated during the initial drafting of the statute, the general intent and spirit of § 448 is entirely consistent with them. The intent of the legislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents. Despite the narrow wording of the step-parent exception, we cannot conclude that the legislature ever meant to terminate the parental rights of a biological parent who intended to continue raising a child with the help of a partner. Such a narrow construction would produce the unreasonable and irrational result of defeating adoptions that are otherwise indisputably in the best interests of children. . . .

* * *

When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest.[5] . . . By allowing same-sex adoptions to come within the step-parent exception of § 448, we are furthering the purposes of the statute as was originally intended by allowing the children of such unions the benefits and security of a legal relationship with their de facto second parents.

As the case law from other jurisdictions illustrates, our paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support. Case law and commentary on the subject detail the years of litigation spent in settling these difficult issues while the children remain in limbo, sometimes denied the affection of a "parent" who has been with them from birth. It is surely in the best interests of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations laws.

We are not called upon to approve or disapprove of the relationship between the appellants. Whether we do or not, the fact remains that Deborah has acted

5. We recognize that, pursuant to *Adoption of M.M.G.C.*, Mother and Polchert could effectively accomplish a second-parent adoption by Polchert first adopting the children and divesting Mother's parental rights and then Mother turning around and adopting the children. *See Adoption of M.M.G.C.*, 785 N.E.2d

267. This is an unwieldy and illogical process, however, that would expose Mother to a substantial risk simply because she is a biological mother rather than an adoptive mother, further demonstrating the absurd result achieved by a contrary holding.

as a parent of [the children] from the moment they were born. To deny legal protection of their relationship, as a matter of law, is inconsistent with the children's best interests and therefore with the public policy of this state, as expressed in our statutes affecting children.

\* \* \*

*Adoptions of B.L.V.B. & E.L.V.B.,* 628 A.2d at 1274–76 (citations and footnotes omitted). We fully endorse this rationale.

Here, Polchert has acted as an involved parent to the children for a greater part of their young lives.[6] While our resolution of the instant case one way or the other will not change this everyday reality, many possible benefits and legal entitlements for the children do hang in the balance. *See In re Jacob,* 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397 (recognizing that child would be irrevocably deprived of the benefits and entitlements of having as her legal parents the two individuals who have already assumed that role in her life, simply as a consequence of her mother's sexual orientation). Our recent decision in *Adoption of M.M.G.C.* recognizes some of the many benefits of a second-parent adoption and concludes, "[a]llowing a second parent to share legal responsibility for the financial, spiritual, educational, and emotional well-being of the child in a stable, supportive, and nurturing environment can only be in the best interest of that child." *Adoption of M.M.G.C.,* 785 N.E.2d at 270–71. Entitlement to these benefits from a second parent cannot rationally hinge on whether the child's natural parent is a biological or adoptive parent.

We conclude that where, as here, the prospective adoptive parent and the biological parent are both in fact acting as parents, Indiana law does not require a destructive choice between the two parents. *See Adoption of Evan,* 153 Misc.2d 844, 583 N.Y.S.2d 997. Allowing continuation of the rights of both the biological and adoptive parent, where compelled by the best interests of the child, is the only rational result. *See id.* We, therefore, reverse the trial court's denial of Polchert's petition to adopt as a second parent and remand for further proceedings consistent with this opinion.

Judgment reversed and remanded.

KIRSCH, C.J., and BARNES, J., concur.

---

6. J.P. is thirteen years old, and K.S.P. is eleven years old. Polchert has been a significant part of their family now for approximately eight years.