870 N.E.2d 517 (2007)
In the Matter of the GUARDIANSHIP OF J.E.M., a Minor.
Maxine E. Handshoe, Appellant-Petitioner,
v.
Jessica L. Ridgway, Appellee-Respondent.
No. 76A03-0612-CV-603.
Court of Appeals of Indiana.
July 23, 2007.
*518 John M. Haecker, Grimm & Grimm, Auburn, IN, Attorney for Appellant.
Christopher J. Wheeler, Stout Wheeler & Zabona, LLP, Angola, IN, Attorney for Appellee.

OPINION
BARNES, Judge.

Case Summary
Maxine Handshoe appeals the trial court's termination of her visitation privileges with her biological grandson, J.M. We reverse and remand.

Issue
The sole restated issued is whether the adoption of J.M.'s adult mother, Jessica Ridgway, automatically terminated as a matter of law any rights Handshoe had to visitation with J.M.

Facts
Handshoe is Ridgway's biological mother. J.M. was born to Ridgway, out of wedlock, in November 2001. In June 2002, with Ridgway's consent, Handshoe was appointed J.M.'s guardian. J.M. had resided with Handshoe since shortly after his birth and he continued to do so until February 2005, when the trial court ordered the guardianship to be terminated. Included in the order terminating the guardianship, the trial court granted Handshoe visitation privileges with J.M., one weekend per month. No party appealed any part of the order terminating the guardianship, including the visitation provision.
In April 2005, Ridgway was adopted in Michigan by her second cousins, Jack and Joyce Mueller. Ridgway was twenty-two at the time of the adoption. In September 2006, Ridgway filed a "Verified Motion for Termination of Grandparent Visitation." App. p. 43. The motion solely alleged that Handshoe was no longer J.M.'s grandmother by virtue of Ridgway's adoption by the Muellers. It did not claim that visitation was no longer in J.M.'s best interests. Handshoe objected to termination of visitation and moved to dismiss Ridgway's motion. Following a hearing consisting entirely of legal argument and no presentation *519 of evidence regarding J.M.'s best interests, on October 20, 2006, the trial court terminated Handshoe's visitation with J.M. Handshoe filed a motion to correct error, which the trial court denied. She now appeals.

Analysis
The first question we have to resolve is whether this case is governed by the Grandparent Visitation Act ("the GVA"), found in Indiana Code Chapter 31-17-5. We addressed a situation similar to the present one in In re Guardianship of K.T., 743 N.E.2d 348 (Ind.Ct.App.2001). There, grandparents were appointed their grandchild's guardian. The trial court later terminated the guardianship, but contemporaneously granted the grandparents visitation rights with the grandchild. No party appealed or otherwise challenged the visitation order until the natural father, who had custody of the child, filed a petition to modify the grandparents' visitation six months after the guardianship had been terminated and visitation established.
We held that the trial court erred in granting the grandparents visitation in conjunction with terminating the guardianship, without the grandparents following the procedures of the GVA. K.T., 743 N.E.2d at 351. We concluded that the GVA provided the exclusive method for grandparents to seek visitation with a grandchild. Id. (citing Matter of Guardianship of Green, 525 N.E.2d 634, 636 (Ind.Ct.App.1988)). However, because no party had objected to or appealed the trial court's original grant of visitation when it terminated the guardianship, any claim of error in that regard was waived. Id. at 352. We went on to review the grandparents' claim that the trial court had abused its discretion in modifying visitation in accordance with the best interests of the child standard of the GVA. Id.
Although Handshoe claims this case is not governed by the GVA, she fails to provide any alternative legal basis upon which she could seek visitation with J.M. This court did recognize a common law right for grandparents to seek visitation with their grandchildren under certain circumstances in Krieg v. Glassburn, 419 N.E.2d 1015, 1019 (Ind.Ct.App.1981). However, following the passage of the GVA shortly after Krieg was decided, we have consistently held that the GVA is the exclusive method for grandparents to seek visitation with their grandchildren and that there is no longer an independent common law right for grandparents to seek visitation. See, e.g., Green, 525 N.E.2d at 636.
It also has been held that one who has had a "custodial and parental relationship" with a child may later seek visitation with the child, if it is in the child's best interests. See In re Custody of Banning, 541 N.E.2d 283, 284 (Ind.Ct.App.1989). It could be argued that Handshoe had a "custodial and parental relationship" with J.M. because she cared for him for the first three years of his life. However, our supreme court has expressed the opinion that the "custodial and parental relationship" right to visitation should extend only to stepparents, for example where a natural parent remarries and later dies, and the stepparent seeks visitation when custody of a child returns to the surviving natural parent. See Worrell v. Elkhart County Office of Family and Children, 704 N.E.2d 1027, 1029 (Ind.1998). Handshoe does not fall into this category.
To the extent Handshoe has any right to visitation with J.M., it is provided by the GVA. Although Handshoe was not originally granted visitation with J.M. in accordance with the GVA, no party objected to that original order. As such, it cannot now be challenged on the basis that it was not issued in compliance with the GVA. See *520 K.T., 743 N.E.2d at 351-52. However, we also believe that the current dispute between the parties must be governed by the GVA, and we will treat the original order as if it had been issued in accordance with the GVA.
The parties here agree that this case solely presents a question of law regarding Handshoe's ability to seek visitation under the GVA; there are no disputed factual issues. The trial court decided Handshoe, as a matter of law, was no longer entitled to visitation with J.M. following Ridgway's adoption. We review questions of law de novo, with no deference to the trial court's determination. Harris v. Harris, 800 N.E.2d 930, 935 (Ind.Ct.App.2003), trans. denied.
Ridgway argues that the GVA is in derogation of common law and must be strictly construed. See Maser v. Hicks, 809 N.E.2d 429, 432 (Ind.Ct.App.2004). However, the GVA is not entirely in derogation of common law. See Krieg, 419 N.E.2d at 1019 ("Grandparents may be awarded visitation rights by overcoming the parent's prima facie rights with a proper showing that such visitation is in the child's best interest.").[1] Additionally, this case concerns the effect of Ridgway's adoption upon Handshoe's ability to seek visitation with J.M. Adoption law also is in derogation of common law.[2] As such, the adoption statutes "must be strictly construed in favor of the rights of the natural parents." Adoptive Parents of M.L.V. v. Wilkens, 598 N.E.2d 1054, 1056 (Ind.1992).
Ridgway does not argue that Handshoe did not meet the criteria for visitation under the GVA at the time of the original order. The GVA allows a maternal grandparent, such as Handshoe, to seek visitation with a grandchild born out of wedlock. See Ind.Code § 31-17-5-1(a)(3).[3] A court may grant grandparent visitation if it determines that visitation is in the best interests of the child. See I.C. § 31-17-5-2(a). If grandparent visitation is established, as it has been here, it may later be modified or terminated, again upon a finding regarding the child's best interests. See I.C. § 31-17-5-7. In addition, to ensure compliance with the United States Constitution, a trial court considering a request for grandparent visitation must enter findings addressing: 1) the presumption that a fit parent acts in his or her child's best interests; 2) the special weight that must be given to a fit parent's decision to deny or limit visitation; 3) whether the grandparent has established that visitation is in the child's best interests; and 4) whether the parent has denied visitation or has simply limited visitation. McCune v. Frey, 783 N.E.2d 752, 757, 759 (Ind.Ct.App.2003) (citing Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)).
A grandparent is defined for purposes of the GVA as including: "(1) the adoptive parent of the child's parent; (2) the parent of the child's adoptive parent; and (3) the parent of the child's parent." I.C. § 31-9-2-77. The GVA lists a number of situations *521 in which the adoption of a grandchild by a third party does not affect a grandparent's right to seek visitation, including adoption by a stepparent or by a person biologically related to the grandchild as a grandparent, a sibling, an aunt, an uncle, a niece, or a nephew. See I.C. § 31-17-5-9. If a person not included in this list adopts a grandchild, the grandparent no longer has a right to seek visitation. See In re Visitation of J.D.G., 756 N.E.2d 509, 512 (Ind.Ct.App.2001). The Muellers do not fall within this list, either in relation to Ridgway or J.M.
The GVA is silent, however, on the question of the effect of an adult parent's adoption on the ability of a biological grandparent to seek visitation with his or her grandchild. This is a question of first impression in Indiana. Our research has revealed that it also appears to be an issue that seldom has arisen anywhere in the country. However, we do find that the Court of Appeal of Florida has addressed precisely this issue under that state's adoption and grandparent visitation laws, in a case called Worley v. Worley, 534 So.2d 862 (Fla.Dist.Ct.App.1988).
In Worley, an adult father began proceedings to be adopted by his stepfather. The father had a son who was five-and-a-half years old, and after the adoption proceedings began the father's natural father filed a petition for grandparent visitation with his grandson under Florida statutes that parallel the GVA.[4] After the adoption was granted, the trial court also granted the grandfather's petition for visitation with the grandson.
The appellate court affirmed, holding that "the adoption of an adult who has children in being at the entry of the judgment of adoption does not operate to sever the relationship of those children with their natural relatives." Worley, 534 So.2d at 863. The court noted that one of the purposes of adoption is "to assure that the severance of family ties by adoption be complete so as to protect the `new family union which the law has created.'" Id. (quoting Beard v. Hamilton, 512 So.2d 1088, 1090 (Fla.Ct.App.1987)). However, the court stated that adoption law "clearly demonstrates an intent to sever the familial relationships only of the person being adopted. Indeed, the only person who need be affected for the purpose of `cementing new family ties' is the adoptee." Id. The court also flatly rejected the father's contention that "since he was adopted, any children are automatically adopted as well." Id. at 863-64. The court noted that there was no evidence that the child's own adoption "was ever at issue." Id. at 864.
The court concluded with the following:
We wish to point out that allowing the natural grandparent of a minor child of an adopted adult to seek visitation will not create a precedent for natural grandparents of adopted children to seek visitation rights with those children. This is because the child himself will have had his former family ties directly severed by the adoption judgment. We also note that any children of an adopted adult born after the judgment of adoption is entered would have no relationship with its natural grandparents, in that a new lineal descendancy was created by the adoption of that parent before their birth. . . . They *522 would therefore be descendants of the adoptive parents through the adoptee. However, in cases such as the one herein, when the child was born while his father was still a lineal descendant of his natural grandfather, the child was born a lineal descendant of his natural grandfather and, as pointed out above, no judgment has operated on him, with the statutorily required consent of his parents, to sever that tie in favor of an adoptive family.
Id. It does not appear that the Florida legislature attempted to amend its grandparent visitation statutes after Worley was decided in order to reverse the result it reached.
We believe that Worley is consistent with the GVA and Indiana law regarding adoption. As a general matter, if a person is adopted, "the biological parents are: (1) relieved of all legal duties and obligations to the adopted child; and (2) divested of all rights with respect to the child." I.C. § 31-19-15-1. It has often been said, "A decree of adoption severs forever every part of the parent/child relationship. The child is severed entirely from its own family tree and engrafted upon another. For all legal and practical purposes, an adopted child is the same as dead to its parents." Matter of Adoption of Topel, 571 N.E.2d 1295, 1298 (Ind.Ct.App.1991). All of this colorful language, however, as well as Indiana Code Section 31-19-15-1, is silent with respect to the effect of an adult parent's adoption on any already-established relationships between a natural grandparent and his or her grandchild. Ridgway essentially is requesting, like the father in Worley, that we view her adoption by the Muellers as an automatic adoption of J.M. by them as well. But there is no evidence in the record that the Muellers adopted him and, like the Worley court, we reject the notion that adoption of an adult automatically results in adoption of any of the adult's existing children for all purposes. We believe a strict construction of the adoption statutes requires such a rejection. Only Ridgway has been severed completely from Handshoe's family tree and engrafted onto the Muellers'; J.M. has not been. Even if Ridgway is "dead" to Handshoe, to use Topel's language, J.M. is not.
It is true that the Muellers now may have their own right to visitation with J.M. pursuant to the GVA, because they are "the adoptive parent[s] of the child's parent." I.C. § 31-9-2-77(1). Additionally, whether J.M. could inherit from Handshoe if she were to die intestate is not something we need to address here. We conclude that Ridgway's decision to legally sever ties with her biological mother, Handshoe, does not automatically and for purposes of the GVA sever all of Handshoe's ties with her biological grandson, J.M., who himself has not been adopted by any third party.
We reverse the termination of Handshoe's visitation privileges and remand to the trial court for further consideration of Ridgway's motion for termination in light of the best interests standard of the GVA and our holding in McCune recited earlier. We would note that although we have held that Ridgway's adoption does not automatically preclude visitation with J.M. by Handshoe, Ridgway's decision to sever ties with Handshoe certainly may be a valid and substantial consideration in deciding whether it is proper to allow further visitation. We also observe, as did the Worley court, that Handshoe would not be able to seek visitation with any children of Ridgway's born after her adoption by the Muellers.

Conclusion
We reverse the termination of Handshoe's visitation with J.M. and remand for *523 further proceedings consistent with this opinion.
Reversed and remanded.
NAJAM, J., and RILEY, J., concur.
NOTES
[1] This court, admittedly, has often failed to mention Krieg when we have said that the GVA is in derogation of common law.
[2] We acknowledge that Ridgway's adoption took place in Michigan. However, a person adopted in another state "has the same rights . . . as though the person had been adopted according to the laws of Indiana." I.C. § 31-19-28-1(2). In addressing the effect of Ridgway's adoption on Handshoe's visitation rights under Indiana law, we will consider Indiana law governing adoptions.
[3] A paternal grandparent can seek visitation with a child born out of wedlock only if the father has established paternity. I.C. § 31-17-5-1(b).
[4] The Florida Supreme Court later held its state's grandparent visitation statutes violate the Florida Constitution. See Von Eiff v. Azicri, 720 So.2d 510, 516-17 (Fla.1998). The GVA has survived constitutional challenges under the United States Constitution. See McCune, 783 N.E.2d at 758-59. Its constitutionality under the Indiana Constitution has not been questioned.