In The Matter of the ADOPTION OF L.M.R., Ricky Rybolt and Margaret Rybolt, Appellants–Petitioners and Respondents,

v.

Bobbie Sue Brooks, Appellee–Petitioner and Defendant.

No. 49A05–0710–CV–586.

Court of Appeals of Indiana.

April 29, 2008.

Norman L. Reed, Indianapolis, IN, Attorney for Appellants.

Kimberly A. Jackson, Herbert A. Jensen, Jensen & Associates, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Petitioners and Respondents, Margaret (Grandmother) and Ricky Rybolt (Grandfather) (collectively, the Grandparents), appeal the trial court's Order denying their Petition for Adoption of L.M.R. in favor of Appellee–Respondent and Petitioner, Bobbie Sue Brooks (Brooks).

We affirm.

### ISSUE

Grandparents raise one issue on appeal, which we restate as: Whether the trial court properly determined that the Marion County Department of Child Services (DCS) failed to act in L.M.R.'s best interest by refusing to consent to Brooks' adoption of the minor.

### FACTS AND PROCEDURAL HISTORY

L.M.R. was born on February 12, 2005 and tested positive for crack and marijuana. As a result, the DCS established L.M.R. was a Child in Need of Services (CHINS) and removed her from the custody of her Mother and putative Father. At the same time, L.M.R.'s older brother, J.R., Jr., was removed from Mother and Father's residence. A younger sibling, J.T.R. was removed from the parents' custody on the day of his birth on June 22, 2006 as he also tested positive for drugs. All three children were born out of wedlock and share the same putative father.

Brooks, a single parent, college graduate and Indianapolis television news producer, took custody of L.M.R. when she was two days' old. Because of Mother's abuse of drugs during her pregnancy with L.M.R., L.M.R. exhibited withdrawal symptoms after birth. She would gnaw on her hand, suck it, and cry, requiring substantial attention to keep calm. L.M.R. also appeared to suffer from allergies, asthma, and eye infections. As she became older, L.M.R. began hitting her head on the wall without responding to pain; she was diagnosed with Sensory Integration Disorder (SID). Brooks sought guidance from First Steps, an early intervention service for children with developmental disabilities, regarding this diagnosis, followed their recommendations, and instructed her daycare provider to do the same.

While L.M.R. was in Brooks' care, Brooks ensured that L.M.R. remained in contact with her siblings. In that regard, Brooks and L.M.R. made weekly or bi-weekly visits with L.M.R.'s Grandparents. In January of 2006, L.M.R. was diagnosed with Respiratory Syncytial Virus (RSV), a respiratory illness, and pneumonia. She was hospitalized for three days. During her hospitalization, Brooks never left her side. Grandmother visited L.M.R. for about one hour, while her Grandfather never visited her at all.

Despite early efforts by the Grandparents to gain custody of L.M.R., the DCS repeatedly recommended, and the trial court ordered, that L.M.R. remain in Brooks' foster care. Nevertheless, on August 8, 2006, when L.M.R. was eighteen months old, the DCS, without any prior notice to Brooks, changed its recommendation. The DCS requested the placement of all three siblings with the Grandparents, with an eye towards eventual adoption by the Grandparents. This request was made

despite the fact that the family case manager had never observed the Grandparents interact with L.M.R. The trial court followed the DCS' recommendation.

The Grandparents have been married for twenty-eight years and have raised four children. None of their four children have graduated from high school or earned a GED and all are unemployed. The Grandparents have at least four grandchildren, none of which were born in wedlock. In the mid 1980s, three separate allegations of child neglect were made against the Grandparents and investigated by Child Protective Services. The three incidences involved claims of a dirty home and were found "substantiated." (Appellant's App. p. 71).

On September 5, 2006, the Grandparents filed their Verified Petition for Adoption of J.R., Jr. and L.M.R. That same month, on September 26, 2006, Brooks filed her Verified Petition for Adoption of J.T.R. and L.M.R. On October 3, 2006, Brooks filed a motion to consolidate both causes, which was subsequently granted by the trial court. On November 13, 2006, the DCS filed its consent to the adoptions of J.T.R. and L.M.R. by the Grandparents. The natural parents of the children consented to the adoption by the Grandparents. On January 25, 2007, the trial court conducted a hearing on the consolidated case. Immediately prior to the hearing, the Grandparents amended their Verified Petition for Adoption by also seeking the adoption of J.T.R. After hearing the evidence, the trial court took the matter under consideration.

On July 30, 2007, the trial court issued its Order, comprising of 113 findings of fact and concluding that:

1. This [c]ourt has exclusive jurisdiction over adoption proceedings. Ind. Code [§ ] 31–19–1–2.

2. Ind.Code [§ ] 31–19–9–1 specifies that a petition for adoption may be granted only if written consent has been executed by the parents and by the agency having legal custody of the child or children who are the subject of the adoption petition. However, that statute further provides that the consent of a father whose paternity has not been established here is not required where that father's consent is implied under Ind.Code [§ ] 31–19–9–15. However, Ind.Code [§ ] 31–19–9–8(a) sets forth several circumstances where the consent of the parents and of the agency having legal custody of the children is unnecessary.

3. Brooks has the burden of proving the consent of [Mother] and [Father] and the DCS, as custodian of the children, to her adoption of [L.M.R.] and [J.T.R.] is unnecessary. Ind.Code [§ ] 31–19–10–1.2.

4. The consents of [Mother] and [Father] to Brooks' adoption of any of their children are not required for several reasons. Ind.Code [§ ] 31–19–9–8(a)(11) provides that the consent of the parents to an adoption is not needed if "a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent" and "the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent." Both parents testified they did not have the ability to care for the children—the equivalent of an admission that they are unfit parents. Further, the evidence showed that both parents are unfit because of their continuing illegal drug abuse, their refusal to earn and apply sufficient income to raising their children, and their general refusal to prioritize their children's needs. Brooks has established that the best interests of the children sought to be adopted would be served it

this [c]ourt dispenses with the consent of the parents.

5. In addition, Ind.Code [§ ] 31–19–9–8(a)(2) provides that the consent of the parents to an adoption of a child is not needed if the child has been in custody of another person and "for a period of at least one (1) year the parent ... knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree." The evidence established that neither [Mother] nor [Father] has provided for the care and support of their three children, although they were able to do so if they had simply remained away from drugs.

6. Further, Ind.Code [§ ] 31–19–9–8(a)(3) provides that the consent to adoption is not needed from a "biological father of a child born out of wedlock whose paternity has not been established: (A) by a court proceeding other than the adoption proceeding; or (B) by executing a paternity affidavit under I.C. [§ ] 16–37–2–2.1." The paternity of [Father]as to [L.M.R.] and [J.T.R.] has not been established, and no paternity affidavit has been issued with respect to them pursuant to Ind.Code [§ ] 16–37–2–2.1 Thus, the consent of [Father] to the adoption of [L.M.R.] and [J.T.R.] is not required.

7. The consent of the DCS to the adoption by Brooks also is not required. DCS is the lawful custodian of the three children. Ind.Code [§ ] 31–19–9–8(A)(10) provides that no consent to adoption is required from "(a) legal guardian or lawful custodian of the person to be adopted who has failed to consent to the adoption for reasons found by the court not to be in the best interests of the child." In its home study with respect to Brooks, the Children's Bureau consented to Brooks' adoption of [L.M.R.] and heartily recommended her as a potential adoptive parent. The DCS placed [L.M.R.] with Brooks for 18 months, during which it expressed no concerns about Brooks' care of L.M.R. The DCS then changed L.M.R.'s placement in August 2006 without explanation. Aside from its suggestion that it wishes to keep the three children together, the DCS has provided no rationale for its change in [L.M.R.'s] placement or its failure to consent to Brooks' adoption of [L.M.R.] and [J.T.R.]. While keeping the children in one home is a laudable goal, it cannot be accomplished here without compromising the best interests of [L.M.R.] and [J.T.R.]. Thus, the consent of the DCS to Brooks' adoption of either [L.M.R] or [J.T.R.] is not necessary under Ind.Code [§ ] 31–19–9–8(a)(10).

8. Alternatively, [Father's] consent is implied. Ind.Code [§ ] 31–19–10–4.5 requires that the putative father who wishes to contest the adoption must do so in accordance with that chapter. If the putative father does not file a motion to contest the adoption or a petition to establish paternity within 30 days after receiving notice of the adoption, his consent is irrevocably implied. Ind.Code [§ ] 31–19–9–12; 31–19–9–18. [Father] did not file a motion to contest the adoption. Therefore, his consent is irrevocably implied.

9. Thus, the consent of [Mother], [Father], and the DCS was either unnecessary or implied with respect to Brooks' petition for adoption. Accordingly, the [c]ourt has authority to grant Brooks' petition for adoption.

11.[1] It is unlikely that [ ] [the Grandparents] would provide adequate edu-

---

1. Conclusion 10 appears to be missing from the trial court's Order.

cation for the child, given their failure to obtain high school degrees and the failure of all of their children, either as teenagers or as adults, to receive high school degrees. The ability or inability to provide suitable education is a factor properly considered in this proceeding pursuant to Ind.Code [§ ] 31–19–11–1. [Grandparents'] daughter who is primarily responsible for the children's care only has less than a 9th grade education. Moreover, the oldest of the grandchildren is not in preschool, and the [Grandparents] offered no testimony indicat[ing] they were seeking to admit any of their grandchildren in preschool at any time.

12. The [c]ourt does not have the same concerns with Brooks, who is well educated and already has emphasized reading and sensory skills with [L.M.R.], Brooks has been employed continuously since her graduation from college. Brooks can provide a home where the children will likely have greater educational opportunities and expectations.

13. Brooks has a very close relationship to [L.M.R.] and [ ] Brooks is better equipped than the [Grandparents] to handle the challenges of a child born addicted to drugs. The [Grandparents'] failure to even recognize any problems arising from that condition is particularly telling.

14. DCS has failed to consent to the adoption of [L.M.R.] by Brooks for reasons that are not in the child's best interests. In the [Grandparents'] home, L.M.R. would be exposed to the parents who neglected [her] in favor of drug abuse.

17.[2] Brooks testified that she would agree to an order of visitation by the [Grandparents] if she were to adopt [L.M.R.] and [J.T.R.]. Brooks appears to understand the importance of the children's biological connection and will be supportive of it. Allowing her to adopt [L.M.R.] would ensure she would have the best opportunities for care, education, and success while ensuring that they continue contact with their older brother, [G]randparents, and extended biological family.

18. The adoption of [L.M.R.] by Brooks is in the best interest of the child.

The adoption of [L.M.R.] by the Grandparents is not in the best interest of the child.

IT IS THEREFORE ORDERED THAT [the Grandparents'] Petition for Adoption of [L.M.R.] be, and is hereby, denied.

(Appellants' App. pp. 27–31).

That same day, the trial court also entered separate Orders, denying Brooks' petition to adopt J.T.R. and granting the Grandparents' petition to adopt J.R., Jr. and J.T.R. On August 13, 2007, the Grandparents filed their Motion to Correct Error or in the Alternative Motion to Stay Proceedings in Order to Preserve the Status Quo, which was subsequently denied by the trial court.

The Grandparents now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Conceding that the trial court properly decided that the parents' consent was not necessary, the Grandparents focus on the trial court's determination that the DCS' failure to consent to Brooks' adoption of L.M.R. was not in the child's best interests. In general, they assert three main reasons why the DCS' consent to Brooks' request to adopt L.M.R. was not unreasonably withheld: (1) the Grandparents offer

---

**2.** Conclusions 15 and 16 appear to be missing from the trial court's Order.

a stable family unit and are experienced in raising children; (2) the Grandparents' adoption would keep the siblings together; and (3) the DCS' decision to withhold consent was based on knowledge and experience.

On review, we will not disturb a trial court's ruling in adoption proceedings unless the evidence would lead to but one conclusion and the trial court reached the opposite conclusion. *In Re Adoption of K.S.P.*, 804 N.E.2d 1253, 1255 (Ind.Ct.App. 2004). We owe no deference to a trial court's legal conclusions. *Id.* We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision. *Winters v. Talley*, 784 N.E.2d 1045, 1046 (Ind.Ct.App.2003), *trans. dismissed.*

Indiana Code section 31–19–9–1 requires that "unless as otherwise provided in this chapter, a petition to adopt a child who is less than eighteen (18) years of age may be granted only if written consent to adoption has been executed by . . . [e]ach person, agency, or county office of family and children having lawful custody of the child whose adoption is being sought." However, if the DCS refuses to consent to the adoption, the trial court must determine whether the DCS is acting in the best interests of the child in withholding its consent. Ind.Code § 31–19–9–8(a)(10). In *In the Matter of Infant Girl W*, 845 N.E.2d 229, 241 (Ind.Ct.App.2006), *trans. denied,* we observed that the consent statute permitted the Office of Family and Children, as the child's legal guardian to express its opinion regarding the adoption, and, if the trial court found that the guardian's consent to adoption was unreasonably withheld, we could review the trial court's determination for reasonableness. *See also In re Adoption of L.C.,* 650 N.E.2d 726, 729–30 (Ind.Ct.App.1995), *trans. denied* (stating that in order to adopt child

despite lack of consent from county agency having lawful custody, prospective parents must show that agency was not acting in child's best interests in withholding consent).

## I. *Stable Family Unit*

First, singling out Brooks' status as a single parent without any experience in childrearing, the Grandparents draw our attention to their longstanding marriage and parenting skills. However, based on our review of the record, we are not convinced that the lengthier parental history necessarily translates into better parenting. During their twenty-eight year marriage, Grandparents raised four children ranging in age from 23 to 28. None of their children completed high school or acquired a GED and none are employed. Their oldest son fathered two children out-of-wedlock, and did not have custody of either of his children. In fact, one of his children had been temporarily placed in foster care. The Grandparents' second child, Father of L.M.R., fathered three children out-of-wedlock, none of which he established paternity for. All three children were taken into foster care. Father acknowledged at trial that he cannot support his children. The Grandparents' only daughter never obtained a driver's license; yet, at the hearing readily admitted to having driven her children without a license.

The record indicates that, raising their grandchildren, the Grandparents taught them early on "to shake their little fist and say: come and get ya some or do you want some of this?" (Tr. p. 197). While visiting the Grandparents, Brooks also observed the grandchildren play a game called "hit the dummy" which entailed giving one of their grandsons a foam bat to hit his parents.

Although Grandparents were well aware that L.M.R. tested positive for drugs at birth, they refused to accept that the child has special needs. The Grandparents' testimony contains no indication that they ever investigated the impact of L.M.R.'s drug addiction at birth on her current or future development. Grandmother's testimony clearly indicated her unawareness of L.M.R.'s SID diagnosis and refusal to further involve First Steps in L.M.R.'s development. Moreover, when L.M.R. was admitted to the hospital with RSV and pneumonia, Grandmother barely took the time to visit her grandchild, while Grandfather was completely absent from the sickroom.

It is well known that one of the purposes of adoption is "to assure that the severance of family ties by adoption be complete so as to protect the 'new family union which the law had created.'" *In re Guardianship of J.E.M.*, 870 N.E.2d 517, 521 (Ind.Ct.App.2007). Here, the DCS determined Mother and Father to be unfit and sought permanent placement for L.M.R. Although the Grandparents conceded at trial that L.M.R.'s parents were unable to care for her, they nevertheless regularly allowed Mother and Father to be around the child. The Grandparents even testified at trial that "[t]his way, if their [M]other and [F]ather ever get their head's straightened up, they can still be a part of their life." (Tr. p. 43). It is equally clear from Mother's testimony that she refuses to accept that she has "lost" her children due to her life-style choices. (Tr. p. 74). Allowing the biological parents unsupervised and regular access to L.M.R. would defy the purpose of adoption and, in effect, place the child permanently back in the drug related environment where her emotional and physical development were threatened in the first place.

Brooks, on the other hand, taking custody of L.M.R. upon birth, "read everything she could in drug babies, how to care for them, what to do." (Tr. p. 164). She consulted medical experts to make L.M.R.'s withdrawal as easy as possible. When L.M.R. exhibited withdrawal signs, Brooks took leave from her employment. Later, after L.M.R. started hitting herself, Brooks contacted First Steps for evaluation and advice and informed herself on L.M.R.'s SID's diagnosis. When L.M.R. was hospitalized with RSV and pneumonia, Brooks remained by the child's bedside day and night. Even though the Grandparents now question Brooks' parenting skills, they offered only positive comments about her care of L.M.R. during trial and effusively praised her efforts. Grandfather stated that she took "beautiful care" of L.M.R. and had "nothing bad to say about her." (Tr. pp. 40, 43). During one of the status hearings, Grandfather even stood up in court and told the trial court that he had no objection to Brooks caring for L.M.R. In sum, Brooks basically altered her life to focus on L.M.R.'s care and needs. She has established a routine in L.M.R.'s life and, at the advice of First Steps, has engaged in particular sensory exercises to address some of the problems created by L.M.R's drug addiction at birth. There is no evidence that the Grandparents engage L.M.R. in special activities or have changed their lives in any way to accommodate L.M.R.'s needs.

Despite the Grandparents' concession of Brooks' excellent care of L.M.R., they now claim that L.M.R. should only be adopted by a "stable family unit," *i.e.*, a two-parent family, as it would protect her and promote her welfare. (Appellants' Br. p. 10). However, while we have recognized that the purpose of Indiana's adoption statute is to provide a child with a stable family unit, a "family unit" is not necessarily interpreted as a two-parent family. This is

perhaps most clearly shown by our General Assembly's enaction of statutes permitting adoptions by not only married couples, but also stepparents and single adults. *In re Adoption of J.B.S.*, 843 N.E.2d 975, 977 (Ind.Ct.App.2006). Regardless, we have always noted that the primary concern in every adoption proceeding is not the type of adoptive family but the best interest of the child. *See id.*

## II. *Separation from Siblings*

As a second overarching argument, the Grandparents assert that their adoption of L.M.R. would keep all three siblings together as they also adopted L.M.R's two brothers. However, trial testimony clearly supports that L.M.R.'s adoption by Brooks would not amount to a permanent separation. Brooks offered to remain in close contact with L.M.R's brothers if given custody. Brooks intends to continue the weekly or bi-weekly visits with J.R., Jr. and J.T.R., like she did prior to the adoption proceedings. In fact, she stated that she looked forward to continue "the bond that we've shared for eighteen months as a family." (Tr. p. 199).

## III. *DCS' Expertise*

Lastly, the Grandparents refer to the DCS' experience as the basis for the agency's decision to withhold consent to Brooks' adoption request. We are not convinced. Yaneen Chestnut (Chestnut) was assigned as L.M.R.'s case manager a year prior to the adoption trial. During his home visits at Brooks' home, he observed that L.M.R. was closely bonded with her foster mother and was "very warm" towards her. (Tr. p. 31). While the record is void of any criticism of Brooks, Chestnut nevertheless recommended placement of L.M.R. with the Grandparents prior to ever even observing their interactions with their grandchild.

Until August of 2006, the DCS consistently recommended temporary placement of L.M.R. with Brooks; the DCS did not make a recommendation regarding permanent placement. Even though DCS' staff held a telephone conference approximately a month before the hearing of August 8, 2006, they did not finalize their decision as to permanent placement until the morning of the trial. Thus, without any change in circumstances of L.M.R.'s care and without any advance notice to Brooks, the DCS changed its position and advocated for the removal of L.M.R. from Brooks' care and for the permanent placement with the Grandparents.

Furthermore, the record reflects that DCS' department policy requires that when a decision has been made to place a child in a permanent placement other than the foster parent's home, the family case manager must review the child's medical records. While Chestnut indicated that he had complied with that policy, he admitted at trial that he did not contact First Steps or discuss L.M.R's diagnosis of SID.

In sum, we find that the Grandparents failed to establish that the trial court's Order was unreasonable. *See Infant Girl W*, 845 N.E.2d at 241. Even though we empathize with the Grandparents, we agree with the trial court that L.M.R.'s adoption by Brooks is in the child's best interest. Not only is Brooks able to provide L.M.R. with a loving and nurturing environment, she also accepts and attempts to resolve L.M.R.'s developmental hurdles, encouraging her every step of the way.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly determined that the DCS failed to act in L.M.R.'s best interest by refusing to consent to Brooks' adoption of the minor

Affirmed.[3]

BAKER, C.J., and ROBB, J., concur.

**3.** We hereby deny Appellants' Verified Motion to Strike, filed with this court on February 27, 2008.